Peter LOGIODICE, et al., Plaintiffs

v.

TRUSTEES OF MAINE CENTRAL INSTITUTE, et al., Defendants

No. 00–CV–246–B–S.

United States District Court,
D. Maine.

Nov. 8, 2001.

Richard L. O'Meara, Murray, Plumb & Murray, Portland, ME, for Plaintiffs.

Bruce C. Mallonee, Edmond J. Bearor, Esq., Luke M. Rossignol, Esq., Rudman & Winchell, Bangor, ME, for Defendants.

## ORDER AND MEMORANDUM OPINION

SINGAL, District Judge.

The parents of a student whose attendance at a private high school was funded by the local public school district brought this action alleging that the student was deprived of his federal and state due process rights when the private school suspended him for misbehavior.[1] The Defendants whom they seek to hold liable for this violation fall within two camps. The private school defendants include the Trustees of Maine Central Institute, Headmaster Douglas Cummings, and Dean of Students John Marquis (collectively, the "MCI Defendants"). The school district defendants include Maine School Administrative District No. 53 and Superintendent Terrance McCannell (collectively, the "MSAD 53 Defendants"). Each set of Defendants has filed a motion for summary judgment, both of which are presently before the Court (Docket # 28 and # 31). For the reasons discussed below, the Court GRANTS IN PART both motions.

## I. BACKGROUND [2]

### A. The Parties

During the 1999–2000 school year, Zachariah Logiodice ("Zach") was an eleventh-grade student attending Defendant Maine Central Institute ("MCI") in Pittsfield, Maine. Zach and his parents, Plain-

tiffs Peter and Dawn Logiodice, reside together in Pittsfield.

MCI considers itself to be an independent private school. It is the only high school—public or private—located within either Pittsfield or the two adjacent communities of Burnham and Detroit. Governing authority over MCI rests with its Board of Trustees. Defendant Douglas Cummings, who is the headmaster of MCI, manages the institution's daily operation, and Defendant John Marquis is its dean of students.

Maine School Administrative District 53 ("MSAD 53") is the local agency responsible for the schooling of children in Pittsfield, Burnham and Detroit. Defendant Terrance McCannell is the superintendent of MSAD 53, and a group of persons collectively known as the School Board constitutes its governing body.

### B. The Relationship Between MCI and MSAD 53

#### 1. Contractual Relationship

Zach was one of several hundred students who, in 1999–2000, attended MCI pursuant to a contract between MCI and MSAD 53. Because there is no public high school within the geographic area that MSAD 53 serves, it contracts to send all of its high-school-aged students to MCI at public expense.

The contract that is relevant to this dispute is signed by the Executive Committee of MCI and the School Board of MSAD 53 and is effective for the ten-year period starting with the 1993–94 school year. (See Contract (Docket # 29, Ex. 11).) It provides that MSAD 53 will send

---

1. Plaintiffs filed as the student's next friends.

2. The facts described in this section are based on the parties' statements of material facts

and supporting factual documents. They are uncontested except where otherwise noted.

all of its ninth through twelfth-grade students to MCI and pay their tuition, and MCI will accept and educate those students.

The contract does not explicitly reserve to MSAD 53 any authority to manage the day-to-day operation of MCI. Rather, it provides that "THE TRUSTEES [of MCI] shall have the sole right to promulgate, administer and enforce all rules and regulations pertaining to student behavior, discipline and all use of the buildings and grounds of THE TRUSTEES." (*See* Contract ¶ 1 (Docket # 29, Ex. 11).) It does not specify which laws, if any, constrain this "sole right."

MCI and MSAD 53 provided for a "joint committee" in the contract, pursuant to 20–A M.R.S.A. § 2703(1)(B) (*See* Contract ¶ 6 (Docket # 29, Ex. 11).). This committee includes four representatives from MCI and four from MSAD 53. Even though the MCI–MSAD 53 joint committee exists, and although it has certain managerial powers pursuant to Maine statute, 20–A M.R.S.A. § 2704, apparently the joint committee has never exercised any of these powers. Mr. McCannell intimated that the MCI–MSAD 53 joint committee is commonly referred to as the "advisory committee" in part because it never has exercised any of its powers. (*See* Terrance McCannell Dep. at 39 ll. 13–18 (Docket # 29, Ex. A).)

## 2. Financial Relationship

Pursuant to the terms of the contract, MCI accepts substantial public funding in the form of tuition payments from MSAD 53. Of MCI's approximately 500 students, about 400 are students whose tuition is paid by MSAD 53. Fifty-one percent of MCI's income is derived from tuition payments from MSAD 53.

## 3. Shared Personnel

Personnel of the two organizations overlap in a few areas. Two individuals who sit on MCI's Board of Trustees as private citizens also happen to be employees of MSAD 53. Their affiliation with MSAD 53 is coincidental, however, and they do not sit on the MCI Board in their "official capacities" as MSAD 53 employees. (*See* SMF in Supp. of MCI's Mot. for Summ. J. ¶ 11 (Docket # 32).) Furthermore, the MCI–MSAD 53 contract does not require that MSAD 53 be represented on MCI's Board.

In addition to the Board of Trustees, a number of committees at MCI address various managerial and administrative issues. One such group recommends to the MSAD 53–MCI joint committee a proposed calendar for the following school year; during some years, that group has included MSAD 53 employees. Otherwise, MSAD 53 employees do not sit on any of the MCI committees.

Mr. Cummings regularly attends the meetings of the MSAD 53 School Board even though he is not a member. Additionally, two or three special education aides, who are employees of MSAD 53, work at MCI each week on a part-time basis. Finally, MCI employees are also entitled to participate in the Maine State Retirement System; however, this entitlement is independent of their relationship with MSAD 53.

## 4. MCI's Interaction with Public Schools

Although MCI is a private school, it does interact with public schools. For example, along with other private schools, MCI's sports teams compete in athletic associations that include public schools. In addition, MCI coordinates with the public middle school in Pittsfield to help transition middle school students to high

school. Finally, MSAD 53 provides busing not only for its students who attend MCI but also, as agreed in the second contract, for *any* MCI students participating in off-campus extracurricular activities.

## C. The Disagreement Between MCI and MSAD 53 Over Discipline at MCI

Notwithstanding their history of cooperation, MCI and MSAD 53 have been at odds over the subject of discipline at MCI for several years. Even before Mr. McCannell's tenure as superintendent, the school and the district squared off over the discipline of a publicly funded student. MCI insisted that the student, who had been caught selling drugs at MCI, be expelled. MSAD 53 held a disciplinary hearing for the student and found that he had in fact been selling drugs but overturned his expulsion. Although MCI grudgingly readmitted the student, at the time Principal Cummings stated that it would be a "cold day in hell" before he would submit a disciplinary decision to the MSAD 53 Board again. (*See* Douglas Cummings Dep. at 199, l. 22 (Docket # 29, Ex. B).)

Stated less colorfully, Mr. Cummings' position was that because MCI was a private school, it did not have to abide by state and federal law requiring public schools to hold due process hearings before suspending or expelling students. He claims that throughout the early- to mid-1990s, Mr. McCannell agreed with this interpretation of the law. In contrast, Mr. McCannell alleges that during this time period, he clearly expressed to Mr. Cummings his view that MCI *was* bound by the same laws as public schools regarding the discipline of MSAD 53 students.

At some point, Mr. McCannell became concerned about what he saw as a discrepancy between MCI's procedure for handling expulsions and state law. On one hand, Maine law required local school boards to hold expulsion hearings for public students. *See* 20-A M.R.S.A. § 1001(9). On the other hand, under the contract between MCI and MSAD 53, MCI could expel a student without sending the decision before the MSAD 53 School Board. Mr. McCannell contacted the Department of Education to seek guidance in resolving what he believed was a conflict between the terms of the contract and state law. He also spoke to Mr. Cummings about his concern. Mr. Cummings did not believe that MCI was required to submit disciplinary decisions to the MSAD 53 Board but assured Mr. McCannell that MCI had its own internal hearing procedures for suspended students.

Although Mr. McCannell believed that federal and state law required due process protections for MSAD 53 students at MCI, he apparently did not think that MSAD 53 had any authority under the contract to enforce his interpretation of the law against MCI. For example, if MCI were to expel a student, the contract gave MSAD 53 no authority to insist that MCI readmit that student. Any disciplinary hearing conducted by the School Board would be futile since MCI could simply refuse to honor the Board's decision, and the Board would have no mechanism for implementing it. Unable under the contract to force MCI to comply with his own view of the law, Mr. McCannell "agree[d] to disagree" with Principal Cummings about whether MSAD 53 students were entitled to due process protections while attending MCI. (*See* Terrance McCannell Dep. at 100, ll. 6-7 (Docket # 39, Attach. 1).) They simply hoped the situation would not arise.

The disagreement resurfaced during negotiations over a subsequent contract, which would take effect as an amendment to the previous contract in February 2001. Although this subsequent contract does not control the parties' relationship at any

time relevant to this lawsuit, the negotiations took place starting in late fall of 1998 and provide relevant background about each party's knowledge and state of mind at the time of the incident that gave rise to this lawsuit. During the negotiations, Mr. McCannell and Mr. Cummings discussed their relative positions about whether MCI was required to treat MSAD 53 students in accordance with the same state and federal laws that govern public schools. In an apparent attempt to eliminate any misunderstanding, the parties negotiated new contract language to "clarify" their understanding. (*See* Cummings Dep. at 147, ll. 2–9 (Docket # 29, Ex. B).) The new contract, which was intended to be effective from February 2001 to 2013 provides, "*As it pertains to public students attending private schools,* THE TRUSTEES [of MCI] shall have the sole right to promulgate, administer and enforce all rules and regulations pertaining to student behavior, discipline and all use of the buildings and grounds of THE TRUSTEES *subject to applicable State and Federal law.*" (*See* Maine School Administrative District # 53 and Maine Central Institute Contract 2003–2013 ¶ 7 (Docket # 29, Ex. 12) (emphasis on new language supplied).)

Unfortunately, there was no understanding to clarify. The parties never agreed upon what the phrase "subject to applicable State and Federal law" meant. Consequently, Mr. McCannell believed that the contract finally made explicit their mutual understanding that MCI was subject to the state and federal laws requiring certain procedures when a public school suspends a student. Meanwhile, Mr. Cummings persisted in believing that MCI did not have to follow such laws because they

were not "applicable" to private schools. This underlying misunderstanding formed the context for the incident involving Zach Logiodice in January 2000.

D. The Incident Involving Zachariah Logiodice

On Wednesday, January 19, 2000, Zach carried a soft drink into MCI's gymnasium, where he was scheduled to take a midterm examination. Because food and beverages were not permitted during an exam, an MCI teacher took the bottle away from Zach. Zach responded by using profane language. When the dean of students, Mr. Marquis, arrived at the gymnasium and questioned Zach regarding his alleged use of profanity, an exchange ensued in which Zach pushed aside a table and directed profane language at Mr. Marquis.

Without providing Zach prior notice or offering him an opportunity to explain his behavior, Mr. Marquis immediately suspended Zach for ten school days. By letter dated Friday, January 21, 2000, he informed Mr. and Mrs. Logiodice that in addition to the ten-day suspension, Zach would not be allowed to return to MCI until the Logiodices provided evidence that he was in counseling and had received a "safety evaluation" from a psychologist or psychiatrist.[3]

E. The Logiodices' Efforts to Effect Zach's Return to MCI

Despite the Logiodices' efforts to make an appointment with a therapist for a "safety evaluation," insurance procedures and the therapists' schedules prevented them from obtaining an appropriate appointment until February 7. Zach's ten-day

---

**3.** The record does not explain what a "safety evaluation" consists of, and it is not clear whether the Logiodices ever received a satisfactory explanation about what sort of procedure would satisfy this requirement.

suspension was set to expire on February 2.

On February 1, Mr. Logiodice contacted MCI to explain the family's difficulty in obtaining an appointment and to ask that Zach be allowed to return to school the following day. Mr. Marquis referred him to Mr. Cummings, who reiterated that Zach would not be allowed to return until he had undergone a safety evaluation.

That same day, February 1, the Logiodices also met with Mr. McCannell to discuss Zach's continuing suspension. Mr. Cummings had informed Mr. McCannell of Zach's suspension prior to this meeting. As a result of the meeting with the Logiodices, Mr. McCannell sent Mr. Cummings a letter, dated February 3, 2000, expressing concern that extending the length of Zach's suspension violated his due process rights. The letter also insisted that MCI should provide "appropriate services for the student" pursuant to the contract between MSAD 53 and MCI. (Letter dated Feb. 3, 2000, from Terrance McCannell to Douglas Cummings (Docket # 1, Ex. 2).)

On Monday, February 7, 2000, Zach and his parents attended Zach's scheduled appointment with a therapist. Later that evening, the Logiodices attended a regularly scheduled meeting of the MSAD 53 School Board. At this public meeting, they told the Board that MCI and MSAD 53 had violated and were continuing to violate their son's due process rights, as well as Maine law. In response, Mr. McCannell agreed that Zach's due process rights had been violated.

On February 8, 2000, Mr. McCannell and Mr. Cummings jointly held a conference with Mrs. Logiodice and said that Zach could return to school after his second appointment with the therapist, provided that the therapist agreed to meet with school officials. On February 11, 2000, the therapist, Zach, and Zach's parents met with Mr. Marquis, Mr. McCannell and several MCI teachers. As a result of the meeting, Zach was permitted to return to school on Monday, February 14, 2000.[4] Between January 19 and February 14, Zach was denied educational services for seventeen school days without the opportunity for a hearing. Zach completed his junior year at MCI without incident and has now graduated from high school.

On November 30, 2000, Mr. and Mrs. Logiodice filed suit as parents and next friends of Zach Logiodice against the Trustees of MCI, Headmaster Cummings, Dean of Students Marquis, Superintendent McCannell, and MSAD 53. Plaintiffs' Complaint features eleven counts: Counts I through V allege that each of the Defendants violated Zach's Fourteenth Amendment due process rights, actionable pursuant to 42 U.S.C. § 1983; Counts VI through X allege that each of the Defendants violated Zach's rights under Article I, section 6–A of the Maine Constitution; and Count XI seeks a declaratory judgment that if a public educational agency enters into a contract with a private school, that private school is bound by the laws restricting the discipline of children in public schools.

## II. SUMMARY JUDGMENT STANDARD

Each of the camps of Defendants has filed a motion for summary judgment along with a requisite statement of material facts. Both motions contain some cross-allegations against the other set of Defen-

---

4. The Complaint states that Zach did not return to school until February 13, 2000. February 13, 2000, was a Sunday; the Court therefore assumes that Zach returned to MCI on Monday, February 14, 2000.

dants. Nevertheless, each set of Defendants has stated that it does not contest the other's motion. Plaintiffs oppose both motions, and the Court will therefore treat them as the party opposing summary judgment.

A federal court grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). Provided that the factual record is fully developed, disposition of issues of law on summary judgment is appropriate. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

When a party has moved for summary judgment on issues of fact that would ordinarily be decided by a jury, the burden is on the party opposing summary judgment to raise a trialworthy issue. *See, e.g., Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 6 (1st Cir.1994). "There is no trialworthy issue unless there is sufficient competent evidence to enable a finding favorable to the opposing party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Basic Controlex Corp. v. Klockner Moeller Corp.*, 202 F.3d

450, 453 (1st Cir.2000). On these issues, summary judgment is appropriate where, on the facts provided, no reasonable jury could find in favor of the Plaintiffs. *See, e.g., Geffon v. Micrion Corp.*, 249 F.3d 29, 35 n. 6 (1st Cir.2001).

## III. DISCUSSION

### A. Section 1983 Claims

Section 1983 authorizes a federal cause of action against persons who, while acting under color of state law, cause a violation of a plaintiff's federal rights. 42 U.S.C. § 1983. Plaintiffs argue that Zach was deprived of his federal due process rights when MCI Defendants Marquis and Cummings added the requirement that Zach obtain a "safety evaluation" before he would be allowed to return from his suspension.[5] This additional requirement essentially converted a ten-day suspension into an indefinite suspension (with a minimum of ten days) without giving Zach notice or opportunity for a hearing.

All Defendants concede that students are entitled to certain due process protections when they are suspended or expelled from public schools, both as a matter of federal constitutional law, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974), and Maine state statute, 20–A M.R.S.A. § 1001(9).[6] Both sets of Defen-

---

**5.** In the Complaint, Plaintiffs also appear to allege that Zach's due process rights were violated at the time of the initial ten-day suspension because he was never given the notice and opportunity to defend himself that *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974), requires even for short suspensions. Defendants appear to concede this factual point, and Plaintiffs do not pursue the theory in later pleadings. In either case, whether the claim is that Zach was entitled to receive notice and a hearing at the time of the initial suspension or at the time the suspension was extended is irrelevant to the outcome of this case.

**6.** 20–A M.R.S.A. § 1001. Duties of school boards.

School boards shall perform the following duties. . . .

(9) Students expelled or suspended. Following a proper investigation of a student's behavior and due process proceedings, if found necessary for the peace and usefulness of the school, they shall expel any student:
 A. Who is deliberately disobedient or deliberately disorderly;
 B. For infractions of violence; . . . .
A student may be readmitted on satisfactory evidence that the behavior that was the cause of the student being expelled will not likely

dants deny, however, that they are liable under section 1983 for Zach's failure to receive notice and a hearing.

"To sustain an action under 42 U.S.C. § 1983, [a plaintiff] must show both: '(i) that the conduct complained of has been committed under color of state law, and (ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States.'" *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir.2001) (quoting *Chongris v. Board of Appeals*, 811 F.2d 36, 40 (1st Cir.1987)). The MCI Defendants argue that they did not act under color of state law. The MSAD 53 Defendants concede that they acted under color of state law but claim that their conduct did not cause any constitutional deprivation that may have occurred.

1. The MCI Defendants' Motion for Summary Judgment

 The MCI Defendants claim that, as an independent private school and its employees, they did not act under color of state law when they suspended Zach. A court analyzing a claim that a private entity functioned as a state actor for purposes of section 1983 must determine whether the defendant has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Because the MCI Defendants are not government employees or entities, Plaintiffs have the burden of demonstrating that the MCI Defendants' conduct is fairly attributable to the state. *Johnson v. Pinkerton Acad.*, 861 F.2d 335, 337 (1st Cir.1988) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Although this inquiry is fact-intensive, it is guided by factors that can be grouped into four basic tests, any one of which, if satisfied, provides a basis for finding that the complained-of conduct was state action for purposes of section 1983:(1) the exclusive public function test; (2) the entwinement test; (3) the nexus test; and (4) the symbiotic relationship test. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001); *Casa Marie, Inc. v. Superior Court of Puerto Rico for the Dist. of Arecibo*, 988 F.2d 252, 259 n. 7 (1st Cir.1993) (approving the exclusive public function test, nexus test and symbiotic relationship test). Plaintiffs focus their arguments on the first two tests.

a. Exclusive Public Function Test

Initially, Plaintiffs argue that the MCI Defendants are state actors because, by supplying MSAD 53 students with a publicly funded education, they fulfill a function that is "'traditionally the exclusive prerogative of the State.'" *Blum*, 457 U.S. at 1005, 102 S.Ct. 2777 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).[7] The Supreme Court has made clear that benefiting the public is not enough; the test emphasizes that the function must

recur. The school board may authorize the principal to suspend students up to a maximum of 10 days for infractions of school rules.

7. *Blum* actually asked a question that is the inverse of that considered here. It asked whether a state agency was liable for the actions of private parties to which it delegated responsibilities. *Blum*, 457 U.S. at 1003, 102 S.Ct. 2777. Nevertheless, the Supreme Court has since cited *Blum* to describe the exclusive public function test that is appropriate in the context presented here, that is, when a plaintiff seeks to hold the private party itself liable under section 1983. *Brentwood*, 121 S.Ct. at 930.

traditionally have been *exclusively* in the state's power. *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). At first blush, Plaintiffs' argument seems to have been foreclosed by the First Circuit and the Supreme Court, each of which already has rejected arguments that a private school that contracts to educate publicly funded students is performing an exclusive public function. *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764; *Johnson,* 861 F.2d at 338; *see also Rendell–Baker v. Kohn,* 641 F.2d 14, 26 (1st Cir.1981), *aff'd,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

The defendant in *Johnson* was Pinkerton Academy, a New Hampshire private school that, like MCI, contracted to educate all the public high school students in the town in which the private school was located. *Johnson v. Pinkerton Acad.,* Civ. No. 84–726–D, 1986 WL 20644, at *1 (D.N.H. Apr. 16, 1986), *rev'd,* 861 F.2d 335 (1st Cir.1988) (describing Pinkerton Academy). The First Circuit reasoned that because private schools had existed in New Hampshire for over a century, "New Hampshire history shows that educating children of high school age was not traditionally an exclusive public function." *Johnson,* 861 F.2d at 338; *see Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. 2764 (holding that private high school that contracted to provide educational alternative to struggling public school students did not perform an exclusive public function). Similarly, the MCI Defendants have provided substantial historical evidence demonstrating a tradition of private school education in Maine.

Plaintiffs nonetheless argue that, unlike Pinkerton Academy, MCI performed an exclusive public function. First, Plaintiffs seek to narrow the inquiry by arguing that even if education itself is not an exclusive public function, "the provision of a *publicly funded* education *to all students between certain ages* . . . has been a[sic] exclusive function of the State of Maine since 1820, and the Province of Maine before that." (Pls.' Opp. to Defs.' Mots. for Summ. J. at 20 (Docket # 37) (emphasis in original).) Characterizing the inquiry this way does not allow Plaintiffs to escape the precedential burden of *Johnson* and *Rendell–Baker,* however. A "publicly funded" education is, by definition, one that the state funds and thereby makes available. Moreover, it is simply not true that the state of Maine has traditionally been the exclusive provider of publicly funded educational *services.* For at least the last two decades, Maine statutes have authorized free public education to be provided through contracts with private schools. *See* 1979 Me. Acts, ch. 431, § 1.

Alternatively, Plaintiffs attempt to distinguish *Johnson* and *Rendell–Baker* because the plaintiffs in those cases were school employees and not students. They argue that language in the First Circuit opinions in both *Johnson* and *Rendell–Baker*[8] limits the holdings of those cases to the proposition that the private schools are not state actors *as to their employees.* *Johnson,* 861 F.2d at 338 ("If there were responsibilities in the present case, they would relate to students, and not to teachers."); *Rendell–Baker,* 641 F.2d at 26 ("[T]hose students of the [private school] who were placed there by their local school committee, particularly those who are compelled to attend under the state's compulsory education laws, would have a stronger

---

8. The Supreme Court in *Rendell–Baker* approved both the reasoning and the holding of the First Circuit's earlier opinion in the case. 457 U.S. at 837, 102 S.Ct. 2764. The Supreme Court did not comment on the portion of the First Circuit opinion suggesting that the outcome might have been different had the plaintiffs been students.

argument than do plaintiffs that the school's action towards them is taken under color of state law. . . .")

Mindful of the principle that a district court should be "especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel," Wright & Miller, Federal Practice and Procedure: Civil 2d § 1357 at 341–43 (1990), the Court opted at the time of its ruling on the Motion to Dismiss to allow the Plaintiffs further opportunity to develop this argument, both legally and factually. (Order on Mot. to Dism. at 10–11 (Docket # 23).) Because the First Circuit's language merely raised the possibility that it might have ruled differently had the plaintiffs been students, but did not decide the issue, it was incumbent upon Plaintiffs to convince the Court that the asserted distinction is not only possible but actually the proper legal conclusion.

Plaintiffs have not directed the Court to any case in any jurisdiction in which a court has held that a private school is a state actor as to its publicly funded students. Meanwhile, the Third Circuit recently considered the claims of a student whose attendance at a private school was both required and paid for by the state and, contrary to the Plaintiffs' argument here, cited *Rendell–Baker* to support its holding that the school did not perform an exclusive public function as to the student. *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 164–66 (3d Cir.2001). *But see Curran v. Bureau of Special Educ. Appeals*, No. 942484, 1994 WL 879547 (Mass.Super.Oct. 24, 1994).

Instead, Plaintiffs argue that the Supreme Court's analysis in *West*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40, dictates the proper outcome here. In *West*, the Court held that a physician who contracted with a state to provide medical services to inmates at a state prison hospital was a state actor for purposes of section 1983. *Id.* at 57, 108 S.Ct. 2250. Plaintiffs assert that *West* applies to this case because the state created an arrangement whereby the inmate, like the public school students in this case, was forced to seek services to which he was entitled from a private party.

*West* is, however, distinguishable on several fronts. First, the physician in *West* entered public property to treat the plaintiff. *Id.* at 44, 108 S.Ct. 2250. Everyone he treated in this facility was incarcerated and was receiving state-funded treatment pursuant to the contract. Under the circumstances, the private doctor looked and acted as a prison employee, and the fact that it later turned out that he was technically an independent contractor did not bar the plaintiff's relief. *See Magagna v. Salisbury Township Sch. Dist.*, No. Civ. A. 98–1033, 1998 WL 961906 (E.D.Pa.1998) (holding that a school administrator whose salary was paid by a private charity was a state actor when she worked in the public school and the students had no way of knowing she was not employed by the public school); *see also Nunez v. Horn*, 72 F.Supp.2d 24, 27 (N.D.N.Y.1999) (distinguishing *West* on the basis that the physician treated an inmate outside the prison hospital). In contrast, the Plaintiffs have failed to establish that the MSAD 53 students and their families were unaware that MCI is a private school.[9] Also unlike the inmate in *West*, the publicly funded students sought the services of the MCI De-

---

9. Plaintiffs claim that when Pittsfield middle school students are given information about attending MCI the following year, they are not informed that MCI is a private high school. Defendants dispute this contention, and the Plaintiffs' record citation only supports the claim that the students are not informed about the nature of the contract between MCI and MSAD 53.

fendants at MCI's privately owned facility, and the MCI Defendants provided those services to a mix of publicly and privately funded students.

Second, unlike high school students, inmates are completely under the control of the state. "The rationale behind the *West* decision lies in the fact that the prisoner relies entirely on prison authorities for medical treatment, and therefore health care in state prisons is the exclusive prerogative of the State." *Okunieff v. Rosenberg*, 996 F.Supp. 343, 355 (S.D.N.Y.1998), *aff'd* 166 F.3d 507 (2d Cir.1999). MSAD 53 students do not rely on the state to provide them with an education in the same way. The government will pay their tuition if they wish to attend MCI. However, they remain free to attend a private school of their choosing at their own expense, request permission from the school district to transfer to a school in another district, or arrange to be home schooled. 20–A M.R.S.A. §§ 5001–A, 5205(6). Although these options might be significantly less convenient than attending MCI, they nevertheless demonstrate a distinction from the situation of prisoners, who are prevented from selecting any other option at all. *Cf. Wade v. Byles*, 83 F.3d 902, 906 (7th Cir.1996) (distinguishing *West* on the basis that the only medical treatment inmates may receive is through the state).

Third, unlike a state's affirmative obligation to provide medical care to incarcerated residents, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), a state has no affirmative constitutional obligation to provide education to its citizens. *Goss*, 419 U.S. at 574, 95 S.Ct. 729. Rather, Maine has undertaken by statute to make sure that citizens have access to education. *See, generally*, 20–A M.R.S.A. § 2. Therefore, MSAD 53 did not delegate an affirmative constitutional obligation to MCI when it contracted with MCI to provide educational services to MSAD 53 students. Rather, it delegated a statutory obligation in accordance with other statutory provisions specifically providing that school districts may contract out their responsibility to educate students. 20–A M.R.S.A. §§ 1258, 2701, 2703. In sum, *West* does not compel the conclusion that MCI was a state actor as to the publicly funded students it educates.

In the absence of controlling Supreme Court or Circuit precedent, or instructive cases from other jurisdictions, the Court looks to Supreme Court and Circuit opinions for a trend or guiding principle to illuminate the issue of whether a private school performs an exclusive public function for its publicly funded students. A survey of Supreme Court cases confirms that to date, the "sovereign-function doctrine" has remained largely within "carefully confined bounds." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). For example, the Supreme Court refused to find that a private organization was fulfilling an exclusive public function by educating students with specialized needs, *Rendell–Baker*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418, serving as a town's only electricity provider, *Jackson*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477, or providing state-funded nursing home care, *Blum*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534.

In contrast, the cases in which the Court has recognized an exclusive public function are those situations in which "the State has delegated [to a private party] a function traditionally and historically associated with *sovereignty*." *Flagg Bros.*, 436 U.S. at 171, 98 S.Ct. 1729 (Stevens, J., dissenting) (emphasis added). For example, the Court has found an exclusive public function where a private party administered elections for public office, *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97

L.Ed. 1152 (1953), used the court system to attach another citizen's property, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), used peremptory challenges in a racially discriminatory manner, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), or provided health care for prisoners, *West*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40. The commonality in each case is that governmental authority was necessary to create the context in which the private actor worked. Absent governmental authority, there would have been no election, judicial attachment proceeding, jury strike process, or incarcerated person in the first place. In contrast, providing education does not depend on the force of the government. Education is a benefit that many citizens would seek from private educators whether the government compelled them to obtain an education or not.

Finally, the Supreme Court recognizes other weighty considerations that lurk in the background in this case. To hold that a private school that accepts publicly funded students is a state actor as to those students could threaten the very nature of private school education. Some members of the Court have considered the exclusive public function test unacceptable precisely because of its potential to turn private schools into state actors. *Evans v. Newton*, 382 U.S. 296, 322, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (Harlan, J., dissenting) ("[T]he example of schools is, I think, sufficient to indicate the pervasive potentialities of this 'public function' theory of state action.")

Justice Marshall, apparently sharing in the reluctance to apply the exclusive public function test to private schools, has suggested that private parties that appear to be performing public functions nevertheless may be exempt from being found state actors for, essentially, public policy reasons. "Private parties performing functions affecting the public interest can often make a persuasive claim to be free of the constitutional requirements applicable to governmental institutions because of the value of preserving a private sector in which the opportunity for individual choice is maximized." *Jackson*, 95 S.Ct. at 464 (Marshall, J., dissenting). Private schools were his primary example of when such an exemption might be appropriate. *Id.* ("Maintaining the private status of parochial schools ... advances just this value.") This Court shares these concerns.

Therefore, although *Rendell–Baker* and *Johnson* are not strictly controlling in a case where, as here, the plaintiff is a publicly funded student, an effort to be true to the principles underlying those cases leads to the conclusion that MCI does not perform an exclusive public function in educating MSAD 53 students.

b. Entwinement Test

Even if MCI does not perform an exclusive public function, the Plaintiffs contend that it is a state actor under a second test that considers the extent to which state officials and agencies are "entwined" with the private organization. *See Brentwood*, 121 S.Ct. at 932. *Brentwood* suggests that the critical consideration is the extent to which public officials are involved in managing and controlling the private organization. *Id.* at 930. In *Brentwood*, the Court was persuaded that a private interscholastic athletic association was a state actor because

[t]here would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which

the Association exists and functions in practical terms.

*Brentwood,* 121 S.Ct. at 932.

By contrast, based upon the uncontested facts, the MSAD 53 officials appear to have little involvement in the management and control of MCI. MSAD 53 has no reserved position on the MCI Board of Trustees, the body which governs MCI. Although MCI and MSAD 53 have explored the possibility of establishing a joint board in the past, MCI rejected the proposal because it wished to maintain its independence. MCI must meet certain state-mandated academic requirements in order to be an "approved private school" that is eligible to contract with a local school district, *see* 20–A M.R.S.A. §§ 2902, 2951. However, MSAD 53 does not control the academic program MCI designs to meets these requirements.

Both sets of Defendants agree that the contracts between MCI and MSAD 53 were intended to make MCI wholly responsible for the day-to-day operation of the school. MSAD 53 did not retain any management authority. Defendant McCannell's understanding was that under the contractual relationship, his only authority was to act as an advocate for the MSAD 53 students who attended MCI. As to disciplinary matters specifically, the Defendants agree that if MCI expelled a student, and the MSAD 53 Board voted to overturn the expulsion, MSAD 53 would have no mechanism by which to force MCI to accept the student back.

On the other hand, the contracts provide for the establishment of a joint committee. By Maine statute, a joint committee, if established, has several powers and duties associated with managing the private school: (a) selecting and employing teachers; (b) setting teachers' salaries; (c) arranging the course of study; (d) supervising instruction; and (e) adopting, amending and enforcing rules pertaining to the private school's "other educational activities." 20–A M.R.S.A. § 2704. Such a committee, if active, could suggest entwinement or joint action between MCI and MSAD 53. It is undisputed, however, that the MCI–MSAD 53 joint committee never exercised any of the powers provided under Maine statute. The mere existence of a joint committee, where that committee declined to exercise any authority to manage MCI, is insufficient to establish entwinement between MCI and MSAD 53.

Plaintiffs also claim that a number of facts pertaining to MCI's funding sources support the conclusion that MCI and MSAD 53 were sufficiently entwined to render MCI a state actor. For example, MSAD 53's tuition payments account for fifty-one percent of MCI's budget. The receipt of state funds, even where those funds constitute the majority of the private entity's budget, is insufficient to establish that the private entity is a state actor, however. *Rendell–Baker,* 641 F.2d at 24. Courts must look for additional indicia of entwinement such as a private party's "enjoy[ing] [a public organization's] money-making capacity as its own," *Brentwood,* 121 S.Ct. at 932, or the state's capitalizing on the private organization's financial dependence in order to control its operations, *Rendell–Baker,* 641 F.2d at 25. Here, the undisputed facts suggest that MSAD 53 had little or no control over the operation of MCI in spite of its tuition contributions, and the receipt of state funds alone does not create entwinement between MCI and MSAD 53.

#### c. Nexus Test [10]

A third test, alternatively termed the nexus analysis and the coercion test, asks

---

**10.** Plaintiffs declined to argue the last two tests on summary judgment. The Defendants

"whether the government exercised coercive power or provided such significant encouragement that the complained-of misconduct ... must be deemed to be the conduct of the government." *Barrios–Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 493 (1st Cir.1996). The Court must focus on the state's role in the complained-of conduct (i.e., the extension of Zach's suspension without due process procedures), rather than the state's relationship to MCI itself. *Id.*

The facts do not suggest that MSAD 53 or any other governmental official or organization coerced or encouraged MCI into suspending Zach or extending his suspension without offering him a hearing. MSAD 53 does not appear even to have acquiesced in the suspension. Even if it had, the state's "mere approval of or acquiescence in the initiatives of a private party" is not sufficient to render a private party a state actor. *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777. Moreover, Defendant McCannell actively encouraged MCI to provide Zach with procedural protections, first in a letter to Defendant Cummings and then in open session at a school board meeting. These facts do not establish that the state in any way encouraged or coerced MCI's actions.

#### d. Symbiotic Relationship Test

The last of the four tests is the "symbiotic relationship" or "joint participant" test, in which a court considers whether the government " 'has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity....' " *Barrios–Velazquez*, 84 F.3d at 494 (quoting *Burton v.*

*Wilmington Parking Auth.* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). A significant, though not dispositive, factor is whether the public entity shares in any profits made by the private organization. *Id.*

The facts do not indicate here that MSAD 53 shared in any profits earned by MCI, and there is no indication that the government otherwise earns money from its contract with MCI. *Cf. Burton*, 365 U.S. at 719, 81 S.Ct. 856 (noting that the city government depended on lease payments from private establishment). Furthermore, there is ample evidence that MCI is "essentially independent in the conduct of its daily affairs." *Barrios–Velazquez*, 84 F.3d at 494–95.

No other facts that might change the Court's conclusion remain disputed; consequently, disposition of the MCI Defendants' arguments on summary judgment is appropriate. *See, e.g., Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445 (1st Cir. 1997) (rejecting appellant's contention that district court erred in deciding as a matter of law whether a police officer was a state actor under section 1983). Because the uncontested facts do not satisfy any of the four tests for state action under section 1983, the Court finds that the MCI Defendants were not acting under color of state law when they suspended Zach without providing him notice and a hearing.

#### 2. The MSAD 53 Defendants' Motion for Summary Judgment

Unlike the MCI Defendants, the MSAD 53 Defendants do not dispute that they acted under color of state law. Rather, they argue that they did not cause the constitutional violation, if any, that oc-

addressed them in their motions, however, and the Court will consider them in the inter-

est of thoroughness.

curred. Plaintiffs counter that the MSAD 53 Defendants are liable on a theory of municipal liability. Specifically, they allege that the violation of Zach's due process rights was caused by (1) a custom or policy maintained by MSAD 53, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); (2) the MSAD 53 Defendants' improper delegation of complete disciplinary authority to MCI; or (3) Defendant McCannell's failure to train or supervise the MCI Defendants adequately, *see City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

### a. The Necessity of an Underlying Constitutional Violation

■ In order to establish that a municipality is liable for a plaintiff's constitutional injury, a plaintiff must first establish a violation of his rights by a municipal employee. *Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir.1996) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)) ("[W]e follow *Heller*'s clear rule and hold that the City cannot be held liable absent a constitutional violation by its officers."). "It follows ineluctably that where there are no constitutional violations by municipal employees there can be no claim of inadequate supervision or training against a municipal employer." *Willhauck v. Halpin*, 953 F.2d 689, 714 (1st Cir.1991). The First Circuit has considered and specifically rejected reasoning that has led other circuits to conclude that " 'an underlying constitutional tort can still exist even if no individual [municipal official] violated the Constitution.' " *Evans*, 100 F.3d at 1039.

In holding above that the MCI Defendants were not state actors under section 1983, the Court also effectively held that no violation of Zach's Fourteenth Amendment rights occurred. The Supreme Court has indicated that, if there is any difference at all between state actors for purposes of the Fourteenth Amendment and persons acting under color of state law for purposes of the section 1983, the former comprise a subset of the latter. *Lugar*, 457 U.S. at 935 n. 18, 102 S.Ct. 2744. This Court's holding that the MCI Defendants are *not* state actors for purposes of section 1983 thus precludes a finding that they violated Zach's due process rights. *See, e.g., Mark v. Borough of Hatboro*, 856 F.Supp. 966 (E.D.Pa.1994), *aff'd* 51 F.3d 1137 (3d Cir.1995) (holding that a municipality could not be held liable because a volunteer fire department was not a state actor and thus could not have committed the requisite underlying constitutional injury).[11] Because municipal liability requires an underlying constitutional violation, and no such violation occurred here, the MSAD 53 Defendants are not liable as a matter of law.

Even assuming, however, that the failure to provide Zach notice and a hearing did constitute a constitutional violation, the uncontested facts do not establish that the MSAD 53 Defendants caused the violation. Because Plaintiffs' theory of liability as to MSAD 53 itself differs from its theory as to Superintendent McCannell, the Court will consider each Defendant separately.

### b. MSAD 53's Policy or Custom[12]

■ Plaintiffs contend that MSAD 53 is liable for instituting a policy or custom

---

**11.** The Third Circuit Court of Appeals ultimately reversed the District Court's determination in *Hatboro* that the volunteer fire department was, in fact, a state actor. It thereby eliminated the basis for the District Court's conclusion that the municipality could not be liable for the actions of the fire department but did not comment on the validity of the analysis itself. 51 F.3d 1137 (3d Cir.1995).

**12.** In their opposition to the motions for summary judgment, Plaintiffs argue for the first

that deprived Zach of his due process rights. *See Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. They refer specifically to the "ongoing failure of the School District Defendants to adequately address the dispute with MCI as to which party bore responsibility for providing a hearing to students like Zach." (Pl.'s Opp. to Defs.' Mots. for Summ. J. at 14 (Docket # 37).)

Ordinarily, the issue of whether a municipality had a custom or policy that caused a violation of a plaintiff's rights is a jury question. *See Trevino v. Gates,* 99 F.3d 911, 920 (9th Cir.1996). Summary judgment is nonetheless appropriate if, on the given facts, no reasonable jury could conclude that the municipality had such a policy or custom. *See Geffon,* 249 F.3d at 35 n. 6.[13]

As an initial matter, the Court is skeptical that this alleged failure could constitute a municipal "policy." A policy causes a constitutional violation where "the deprivation resulted (1) 'from the decisions of [the municipality's] duly constituted legislative body,' or (2) from the decisions 'of those officials whose acts may fairly be said to be those of the municipality.'" *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997) (quoting *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). The notion of a municipal policy normally refers to

something akin to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the officers of a local governing body.]" *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; *see, e.g., Swain v. Spinney,* 117 F.3d 1, 4, 5 (1st Cir.1997) (referring to written policy on strip searches and police practices manual as municipal "policy").[14]

The Court will therefore analyze Plaintiffs' claim as a claim that MSAD 53's failure to address its ongoing disagreement with MCI constituted a custom or practice that caused a violation of Zach's rights. In order for a municipality to be held liable, the custom or practice must be "attributable to the municipality" and "must have been the cause of and the moving force behind the deprivation of constitutional rights." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989). A claimant may establish the existence of a custom by demonstrating behavior that is so "wellsettled [sic] and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id.* (police department's habit of entering residences without a warrant); *see Miller v. Kennebec County,* 219 F.3d 8 (1st Cir. 2000) (police department's practice of strip

---

time that the MSAD 53 Defendants are also liable for their own failure to hold hearings for Zach after MCI suspended him. This theory of liability is not detectable in the Complaint, and Plaintiffs are not entitled to raise a new theory of liability for the first time in opposition to a motion for summary judgment. *See Mauro v. S. New Eng. Telecomms., Inc.,* 208 F.3d 384, 386 n. 1 (2d Cir.2000).

**13.** Plaintiffs have not requested a jury trial. Practically speaking, therefore, if the Court were to deny the motions for summary judgment and allow the Plaintiffs to proceed to trial, it would simply be delaying its own conclusion on these issues to a later date.

Nevertheless, in the interest of fairly assessing whether Plaintiffs have raised a trialworthy issue sufficient to survive summary judgment, the Court will engage in the analytical exercise of whether there is any understanding of the facts on which a "reasonable jury" would grant the Plaintiff relief.

**14.** The Court declines to address whether the contract between MSAD 53 and MCI would constitute a "policy" implemented by MSAD 53, because Plaintiffs specifically deny seeking to base liability on the contract itself. (*See* Pls.' Opp. to Defs.' Mots. for Summ. J. at 14 (Docket # 37).)

searching arrestees regardless of whether they were suspected of carrying contraband).

In this case, the Plaintiffs have not provided facts from which a reasonable jury could conclude that the practice of suspending students from MCI without giving them appropriate due process protections was sufficiently well settled and widespread. The uncontested facts reveal one prior occasion twelve years ago on which the MCI Defendants disciplined a public school student and similar issues arose. This one incident does not constitute the kind of repeated and widespread violation that rises to the level of a practice or custom. In fact, MSAD 53 did conduct a hearing in the prior incident, and Defendant Cummings only decided *after* the incident that in the future, MCI would not submit future disciplinary decisions to MSAD 53's hearing procedure. This alone would not have put MSAD 53 on notice of a developing unconstitutional practice that it was required to rectify.

More importantly, even if a factfinder were to conclude that the discussions between Defendants McCannell and Cummings gave the MSAD 53 Board actual knowledge of MCI's intention not to send expelled MSAD 53 students before the School Board, no reasonable jury would conclude from the undisputed facts that MSAD "did nothing to end the practice." Defendant McCannell independently researched the issue and repeatedly stated to Defendant Cummings that he believed MCI was required to provide due process protections to MSAD 53 students. Moreover, in Zach's case, Defendant McCannell wrote a letter to Defendant Cummings urging him to provide Zach with due process protections. He also expressed publicly in a school board meeting his opinion that MCI was violating both the law and the contract. Finally, over a year before Zach's suspension, the Defendants undertook to renegotiate the contract between MCI and MSAD 53 and added language they hoped would clarify their legal obligations.

In short, the uncontested facts establish that the Defendants were aware that they disagreed about which of them was required to provide MSAD 53 students with due process hearings and were simply unsuccessful in resolving the disagreement to anyone's satisfaction. MSAD 53, through Defendant McCannell, actively attempted, albeit ineffectively, to persuade MCI that it was responsible for providing MSAD 53 students with constitutional protections. These facts do not rise to the level of acquiescence in unconstitutional practices that would support a claim for municipal liability. *Compare Bordanaro*, 871 F.2d at 1156 (noting that a jury could properly find a practice or custom where supervising officers were present on numerous occasions when officers broke down doors without a warrant and failed to stop the practice).

c. MSAD 53's Delegation of Authority to the MCI Defendants

Plaintiffs next argue that the relationship between the Defendants, in which MSAD 53 failed to retain any contractual authority over MCI regarding the discipline of MCI students, subjects Defendant MSAD 53 to liability.[15] Unfortunately,

---

15. In their Complaint, Plaintiffs contend that Defendant McCannell is liable under this theory. The Court agrees with Defendant McCannell's argument that, since he is not a party to the contract with MCI, he is not the proper target of this allegation. Plaintiffs seem to concede this point and argue, in their response to the motions for summary judgment, that MSAD 53 is liable for this delegation of authority. The Court will give them the benefit of the doubt and treat this claim as

Plaintiffs do not try to fit this allegation into any established framework for municipal liability. Nor do they cite to any case that addresses a similar claim.

Although the Court finds itself analyzing this claim in a precedential void, several factors counsel against holding MSAD 53 liable for delegating to MCI complete authority for the discipline of MSAD 53 students. First, the finding above that MSAD 53 did not delegate an "exclusive public function" to MCI when it entered into the contract for educational services suggests that MSAD 53 was not constitutionally prohibited from entering into this type of contract.

Furthermore, Plaintiffs have not established that MSAD 53 acted with deliberate indifference to the public students' rights. *See, e.g., City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197 (emphasizing the importance of the "deliberate indifference" requirement in other types of municipal liability claims). Rather, Defendant McCannell, who acted as MSAD 53's representative, was aware that MCI had hearing procedures of its own and believed that they would provide procedural protections for the students. He also acted as an advocate for the MSAD 53 students who attended MCI and, in Zach's case, participated in meetings and discussions with the MCI Defendants regarding his discipline. These efforts by Defendant McCannell preclude a finding that MSAD 53 was deliberately indifferent to Zach's constitutional rights.

Finally, MSAD 53 acted in accordance with a Maine state law that explicitly approves contracts of this nature and does not require school districts to reserve any particular functions to themselves. 20–A M.R.S.A. §§ 1258, 2701. Plaintiffs have not challenged the constitutionality of the

Maine scheme itself. In the absence of any authority demonstrating that a claim of this nature is viable, the Court cannot conclude that the delegation of disciplinary authority to MCI, effected in accordance with state law, subjects the school district to liability under section 1983.

### d. Defendant McCannell's Failure to Train or Supervise

Plaintiffs allege that Defendant McCannell caused a violation of Zach's due process rights by failing to ensure that the MCI Defendants protected those rights. This allegation appears to be a failure-to-supervise claim since elsewhere in the Complaint, Plaintiffs claim that Defendant McCannell acted with deliberate indifference in failing to train and supervise the MCI Defendants adequately regarding the due process rights of publicly funded students at MCI.

As with the existence of a municipal policy or custom, whether a defendant's conduct amounted to a failure to train or supervise an employee that caused a constitutional violation is normally a jury question. *See, e.g., Bordanaro,* 871 F.2d at 1162 (considering the sufficiency of the evidence to support a jury's conclusion that the mayor and chief of police failed to train police officers). On summary judgment, the Court must therefore decide whether the Plaintiffs have presented sufficient facts to allow a jury to find that Defendant McCannell failed to properly train or supervise the MCI Defendants. *See Trevino,* 99 F.3d at 920; *Ricketts v. City of Columbia,* 36 F.3d 775, 779 (8th Cir.1994).

A municipal or supervisory defendant may be held liable for a failure to train or supervise subordinates "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into con-

---

being directed against MSAD 53, rather than Defendant McCannell.

tact." *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197; *see, e.g., Bordanaro,* 871 F.2d at 1162 (noting that jury had evidence to find failure to train and supervise where police officers repeatedly engaged in unconstitutional searches). Plaintiffs' claim fails in two respects. First, they have presented no facts from which a jury could conclude that Defendant McCannell had any authority to train or supervise Defendants Cummings and Marquis. He considered them "colleagues," rather than subordinates, and treated them as independent professionals to whom he gave advice, rather than orders. (*See* Terrance McCannell Dep. at 22, l. 18 (Docket # 39, Attach. 1).)

Second, and more importantly, Defendant McCannell's attitude toward Zach's rights can hardly be characterized as "deliberate indifference." As described above, on more than one occasion he advised the MCI Defendants that he believed they were required to provide MSAD 53 students with due process protections, and he made specific efforts at the time of Zach's suspension to help him obtain a hearing. It appears that he was unsuccessful precisely because he had a collegial, rather than a supervisory, relationship with the MCI Defendants.

Plaintiffs have failed to establish that the MCI Defendants were subordinate to Defendant McCannell in any way, nor have they presented facts from which a jury could conclude that Defendant McCannell was "deliberately indifferent" to Zach's constitutional rights. Therefore, Defendant McCannell cannot be liable for failing to train or supervise the MCI Defendants.

## B. Declaratory Relief

 In addition to compensation, Plaintiffs in their Complaint requested a declaration that the contract between MSAD 53 and MCI incorporates due process limitations imposed by federal and state law.

The MCI Defendants argue that the declaratory relief is inappropriate because since the filing of this lawsuit, Zach has graduated from high school and no longer attends MCI. By failing to respond to the MCI Defendants' argument, Plaintiffs are deemed to have abandoned this request for relief. *See Grenier v. Cyanamid Plastics,* 70 F.3d 667, 677 (1st Cir.1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived."). Dismissal of Count XI is therefore appropriate.

## C. State Law Claims

Having granted Defendants summary judgment on all the federal claims, the Court has discretion to dismiss the remaining state law claims. 28 U.S.C. § 1367(c). *Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir.1992). In the absence of any argument by the parties regarding how the state due process provisions might differ from federal due process provisions, the Court declines to rule on the state law claims and simply dismisses them without prejudice to their being renewed in state court.

## IV. CONCLUSION

Based on the foregoing, the Court GRANTS IN PART the Motion for Summary Judgment filed by Defendants MSAD 53 and McCannell (Docket # 28). The Court also GRANTS IN PART the Motion for Summary Judgment filed by Defendants MCI, Cummings and Marquis (Docket # 31). Specifically, summary judgment is GRANTED as to all Defendants on Counts I–V. Counts VI–X are DISMISSED WITHOUT PREJUDICE. Count XI is DISMISSED as moot.

SO ORDERED.