296 F.3d 22
 Zachariah LOGIODICE, Plaintiff, Appellant,
v.
TRUSTEES OF MAINE CENTRAL INSTITUTE, Douglas C. Cummings, John Marquis, Terrance C. McCannell and Maine School Administrative District No. 53, Defendants, Appellees.
 No. 01-2721.
 United States Court of Appeals, First Circuit.
 Heard April 3, 2002.
 Decided July 18, 2002.
 
 COPYRIGHT MATERIAL OMITTED Richard L. O'Meara with whom Barbara T. Schneider and Murray, Plumb & Murray were on brief for appellant.
 Peter T. Marchesi with whom Wheeler & Arey, P.A. were on brief for appellees Terrance C. McCannell and Maine School Administrative District No. 53.
 Bruce C. Mallonee with whom Luke M. Rossignol and Rudman & Winchell, LLC were on brief for appellees Maine Central Institute, Douglas C. Cummings, and John Marquis.
 Before BOUDIN, Chief Judge, LYNCH and LIPEZ, Circuit Judges.
 BOUDIN, Chief Judge.
 
 
 1
 Maine School Administrative District No. 53 — the local government agency responsible for schooling children in the Maine communities of Pittsfield, Burnham, and Detroit — does not operate its own public high school. Instead it underwrites secondary education for students through a contract with Maine Central Institute ("MCI"), a privately operated high school in the district. See 20-A M.R.S.A. § 2701 (West 1993 & Supp.2001). The contract — originally for a ten-year term starting in 1983 and later extended through separate agreements for two more ten-year periods (starting in 1993 and 2003) — provides that MCI will accept and educate all of the school district's students in the ninth through twelfth grades in exchange for specified tuition payments by the school district.
 
 
 2
 Zachariah Logiodice was an eleventh grade student at MCI during the 1999-2000 school year. On January 19, 2000, he cursed at a teacher, Mr. Harper, who had confiscated his soda just prior to a mid-term English exam. Harper immediately reported the incident to MCI's dean of students, John Marquis, who told Zach he would be suspended if he did not leave the gym where the exam was being held. According to Marquis, Zach then approached Marquis and cursed defiantly at him; Zach denies this and says he simply asked Marquis for his soda back. In any event, Zach does not dispute that he refused to leave the classroom.
 
 
 3
 After the exam, Marquis called Zach's mother and asked her to pick Zach up from school. When she arrived, Marquis described the incident and informed her that Zach would be suspended for ten school days; he also told her that both he and Harper had felt threatened by Zach's behavior. Marquis met with both Zach's parents later that afternoon and at that point suggested that Zach see a counselor. Two days afterward, Marquis sent a letter to Zach's parents confirming the ten-day suspension and also indicating for the first time that Zach would not be allowed to return to school even after ten days unless he obtained counseling and a "safety evaluation" from a licensed psychologist.
 
 
 4
 Nine school days later, on February 1, 2000, Zach's parents were still unable to get the required "safety evaluation" for Zach. The psychologist they contacted did not have an appointment available until February 7 and further told them that no psychologist would be willing to give such an evaluation. At this point, Zach's parents called MCI's headmaster, Douglas Cummings, requesting that Zach be allowed to return to school without the evaluation and arguing that a suspension of greater than ten days would violate state law, see 20-A M.R.S.A. § 1001(9). Cummings refused the request, saying that the law did not apply to private schools including MCI.
 
 
 5
 Zach's parents then asked the superintendent of the school district, Terrance McCannell, to intercede on their behalf. McCannell wrote a letter to Cummings expressing concern that any suspension beyond ten days would violate Zach's rights; he also suggested that it would violate MCI's contract with the school district. On February 7, 2000, Cummings met with McCannell and Zach's parents and agreed that Zach could return to school if the psychologist met with Zach a few more times and assured school officials that he would not pose a threat at school. Zach was finally allowed to return to school on February 15, 2000 — seventeen school days after the initial incident.
 
 
 6
 On November 29, 2000, Zach's parents filed on Zach's behalf a section 1983 suit in federal court in Maine against MCI, the school district, and the individuals involved. 42 U.S.C. § 1983 (1994 & Supp. V 1999). The complaint alleged that MCI, Cummings, and Marquis (collectively, "MCI") had violated procedural due process requirements by suspending Zach without giving him an opportunity for a hearing, see Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), and that the school district and McCannell (collectively, "the school district") had improperly delegated to MCI power to discipline publicly funded students without adequately assuring that MCI followed federal due process safeguards.
 
 
 7
 The district court initially denied defendants' motion to dismiss for failure to state a claim, Logiodice v. Trustees of Me. Cent. Inst., 135 F.Supp.2d 199 (D.Me.2001), but after receiving the parties' factual submissions granted summary judgment to both sets of defendants, Logiodice v. Trustees of Me. Cent. Inst., 170 F.Supp.2d 16 (D.Me. 2001). The district court also dismissed plaintiff's parallel claims brought under the state due process clause. Id. at 34. Plaintiff now appeals to this court.
 
 
 8
 We start with the claims against MCI. The district court did not reach the merits of plaintiff's procedural due process claim because it found at the threshold that MCI was not acting "under color of state law." 42 U.S.C. § 1983. In most contexts, section 1983's "under color of state law" requisite is construed in harmony with the state action requirement of the Fourteenth Amendment. Lugar v. Edmondson Oil Co., 457 U.S. 922, 931-35, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Broadly speaking, the Fourteenth Amendment protects individuals only against government (leaving private conduct to regulation by statutes and common law). E.g., The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).
 
 
 9
 Yet under several doctrines, acts by a nominally private entity may comprise state action — e.g., if, with respect to the activity at issue, the private entity is engaged in a traditionally exclusive public function; is "entwined" with the government; is subject to governmental coercion or encouragement; or is willingly engaged in joint action with the government. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The doctrines are too generally phrased to be self-executing: the cases are sensitive to fact situations and lack neat consistency. See id.
 
 
 10
 Nevertheless, existing doctrine provides the starting point and framework for analysis. Plaintiff's first claim on appeal is that MCI is a state actor because (in plaintiff's words) "it was performing the traditional public function of providing public educational services" to the school district's high school students. Under the "public function" doctrine, the Supreme Court has identified certain functions which it regards as the sole province of government, and it has treated ostensibly private parties performing such functions as state actors. The classic cases are the conduct of elections, e.g., Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), and the governance of a "company" town, Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).
 
 
 11
 So far as the public function test is based on historical practice (as opposed to a normative judgment), see, e.g., San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 545, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), plaintiff cannot meet it. This is because under Supreme Court precedent, it is not enough that the function be one sometimes performed by government — an approach that would exclude little, given the diversity of activities performed by modern governments. Rather, where the party complained of is otherwise private, the function must be one "exclusively reserved to the State." Flagg Bros. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (emphasis added).
 
 
 12
 Obviously, education is not and never has been a function reserved to the state. See, e.g., Pierce v. Soc'y of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). In Maine, as elsewhere, schooling, including high school education, is regularly and widely performed by private entities; this has been so from the outset of this country's history. See Chadbourne, A History of Education in Maine 111 (1936); Bowen, The History of Secondary Education in Somerset County in Maine 16-22 (1935). MCI itself was founded in 1866. Chadbourne, supra, at 283. Accordingly, the Supreme Court, in Rendell-Baker v. Kohn, 457 U.S. 830, 840-43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), aff'g 641 F.2d 14 (1st Cir.1981), and lower courts, including this one, see Robert S. v. Stetson Sch., Inc., 256 F.3d 159, 165-66 (3d Cir.2001); Johnson v. Pinkerton Acad., 861 F.2d 335, 338 (1st Cir.1988), have declined to describe private schools as performing an exclusive public function. See also Jackson v. Metro. Edison Co., 419 U.S. 345, 354 n. 9, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).
 
 
 13
 Admittedly, both Rendell-Baker and Johnson involved claims to due process protection made by teachers and not students; our own decisions in both cases held out the possibility that students might have a better claim. Johnson, 861 F.2d at 338; Rendell-Baker, 641 F.2d at 26. Whether state actor status should depend on who is suing is debatable, see, e.g., Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 527 (2d Cir.1996), and the Supreme Court's decision in Rendell-Baker did not encourage such a distinction. In any event, any stronger claim by students would be based not on historical practice but on normative judgments (more is to be said about this below).
 
 
 14
 Plaintiff essentially concedes that education, as a category, is not from a historical standpoint the exclusive province of government; but his brief seeks to narrow and refine the category as that of providing a publicly funded education available to all students generally. MCI, he says, is different from other private schools; although it admits some non-district students selectively, it admits all district students and so serves as the school of last resort for students in the district. There is no indication that the Supreme Court had this kind of tailoring by adjectives in mind when it spoke of functions "exclusively" provided by government. However this may be, even publicly funded education of last resort was not provided exclusively by government in Maine.
 
 
 15
 Before public high schools became widespread, private grammar schools and academies received public funds and were the only secondary education available. See Chadbourne, supra, at 104-35, 273-87. And even as towns increasingly built their own public schools beginning in the mid-1800s, some municipalities continued to rely on publicly funded private schools to provide free secondary education. In fact, the first statewide high school law providing money to municipalities for the establishment of local public schools also contained the original version of 20-A M.R.S.A. § 2701 — the current provision allowing school districts to provide education through contracts with private high schools. See id. at 378-79, 515-16 (citing 1873 Me. Laws ch. 124, § 7). Other states had similar laws early on. E.g., 1904 Vt. Acts & Resolves No. 37, § 2; 1874 N.H. Laws ch. 69, § 1.
 
 
 16
 Plaintiff also invokes the "entwinement" doctrine, to which we now turn. According to Brentwood, a private entity may be classed as a state actor "when it is `entwined with governmental policies' or when government is `entwined in [its] management or control.'" 531 U.S. at 296, 121 S.Ct. 924 (quoting Evans v. Newton, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)). In Brentwood, the defendant was a non-profit association that set and enforced standards for athletic competition among schools both private and public. At issue was the association's enforcement of recruitment rules alleged by a member school to violate the First and Fourteenth Amendments. Brentwood, 531 U.S. at 291-93.
 
 
 17
 A closely divided Supreme Court applied the state action label to the association. The opinion stressed two points: that the membership of the association was comprised overwhelmingly (84 percent) of "public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling," Brentwood, 531 U.S. at 299-300, 121 S.Ct. 924, and that in substance the association (replacing previous state school board regulation) set binding athletic standards for state schools, including the recruiting standards at issue in the case, id. at 300-01, 121 S.Ct. 924.
 
 
 18
 In our own case, there are certainly connections between the state, the school district and MCI. The state regulates contract schools in various respects, see 20-A M.R.S.A. §§ 2702, 2901, 2902, 2951; most (about 80 percent) of MCI's students are sponsored by the school district; the school district contributes about half of MCI's budget; and in certain respects (public busing to extracurricular events, transfer of lower-school records, assistance with registration), MCI students are treated as if they were regular public school students.
 
 
 19
 But unlike the association in Brentwood, MCI is run by private trustees and not public officials; two officials of the school district (a school principal and a teacher) are trustees but serve as private citizens. And looking to the particular activity sought to be classed as state action, see Blum v. Yaretsky, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) — namely, the imposition of discipline on students — there is no entwinement: The MCI contract provides, with minor variations in language among the three versions, that "the Trustees shall have the sole right to promulgate, administer and enforce all rules and regulations pertaining to student behavior, discipline, and use of the buildings and grounds."
 
 
 20
 One might suspect that, given its financial leverage, the school district could have framed the contract to dictate in detail the disciplinary procedures to be followed or could have insisted on participating in such decisions. But wisely or not, internal operations of MCI, and certainly the disciplinary structure and decision-making at issue here, have been left to MCI subject only to an arguable obligation to comply with regulations governing the school district (a point to which we return below).
 
 
 21
 A "joint committee" of three MCI trustees and three school board members was created in the initial ten-year contract and, once created, theoretically could have exercised broad powers over personnel decisions, curriculum, and MCI's "other educational activities." 20-A M.R.S.A. § 2704(2). But the committee in fact never exercised any such authority and was described in the initial contract as existing only in an "advisory capacity." The most recent ten-year extension (effective starting in 2003) expressly renames it an "advisory committee." Looking to substance, see Brentwood, 531 U.S. at 301, 121 S.Ct. 924, both sides concede that day-to-day operations, including discipline, are in the hands of MCI.
 
 
 22
 Thus, MCI does not fit within the two state-action exceptions invoked by plaintiff on appeal, nor other arguable exceptions that were discussed by the district court but are no longer relied upon by plaintiff. Logiodice, 170 F.Supp.2d at 28-29. Yet this does not exhaust the analysis: the reality is that some of the cases applying the state action label do not fit well into any established exception but are closer to ad hoc normative judgments.[1] See Brentwood, 531 U.S. at 295-96, 121 S.Ct. 924. The difference is that the ad hoc cases have not yet congealed into formal categories.
 
 
 23
 Exemplifying this point, plaintiff's best case may be West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). There a state prisoner, claiming serious mistreatment by a doctor, brought a section 1983 suit against the doctor, asserting a claim of cruel and unusual punishment. Assuming deliberate indifference, the doctor would clearly have been liable to suit if he had been a full-time state employee. See Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Supreme Court in West said that the result was the same even though the doctor furnished the medical services to prisoners on a part-time basis and was technically an independent contractor with the state rather than a state employee. 487 U.S. at 55-57, 108 S.Ct. 2250.
 
 
 24
 The Supreme Court's analysis did not rely directly on the public function doctrine or any other organized body of precedent. Cf. Brentwood, 531 U.S. at 295-96, 121 S.Ct. 924. The decision emphasized both that the plaintiff was literally a prisoner of the state (and therefore a captive to whatever doctor the state provided) and that the state had an affirmative constitutional obligation to provide adequate medical care to its prisoners, a duty the doctor was fulfilling. West, 487 U.S. at 54-55, 108 S.Ct. 2250 (citing Estelle, 429 U.S. at 103-04, 97 S.Ct. 285). By contrast the plaintiff in our case is not required to attend MCI; and the Supreme Court has rejected any federal constitutional obligation on the state to provide education, see San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
 
 
 25
 Admittedly, an argument could be made in our case for creating a new ad hoc exception. Maine has undertaken in its Constitution and statutes to assure secondary education to all school-aged children (until age 17, it is compulsory). See Me. Const. art. VIII, pt. 1, § 1; 20-A M.R.S.A. §§ 2, 5001-A(3). Without such an education most children would be greatly handicapped in life. Although MCI is not a public school in the conventional sense, it is for those in the community the only regular education available for which the state will pay. A school teacher dismissed by a private school without due process is likely to have other options for employment; a student wrongly expelled from the only free secondary education in town is in far more trouble, unless his parents are rich or mobile.
 
 
 26
 This threat of wrongful expulsion from the local school of last resort (at least for those who cannot pay) is the heart of the impulse to expand the state action doctrine to reach this case. Faced with this threat, the temptation might be strong to couple the fact of state funding with the last resort status of MCI and tailor some new exception. But creating new exceptions is usually the business of the Supreme Court; to make one here, we would have to be persuaded that the threat is serious, reasonably wide-spread, and without alternative means of redress. None of these elements is satisfied in this case.
 
 
 27
 To begin with seriousness, Zach may well not have received the precise due process that would be required if MCI were a public school, cf. Goss, 419 U.S. at 581-84, 95 S.Ct. 729, but neither was he deprived of all procedural protection. Both he and his parents were fully informed of the reasons for the ten-day suspension and there is no indication that they ever disputed the factual allegations. Missing 17 days of school is a cost, but many in an era of school violence would think that a school faced with Zach's apparent behavior might want expert reassurance. Even a public school student may be sent home without a hearing if a teacher perceives a threat of violence, id. at 582-83, 95 S.Ct. 729.
 
 
 28
 Nor is there any evidence — we speak of Brandeis brief facts, not courtroom proof — that contract schools in Maine are disciplining students in an outrageous fashion and leaving Maine school children without an education. There are costs (rigidities, law suits), and not just benefits in inflicting constitutional standards wholesale upon privately governed institutions. See, e.g., New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Fourth Amendment regulation of searches of students); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (First Amendment limitations on student dress codes). Before creating a new state action category, a lower court is entitled to insist upon some showing of need — beyond the small arguable unfairnesses that are part of life.
 
 
 29
 Finally, we are confident that state law provides protection against serious abuse. As noted above, the contract gives MCI control over discipline of students. But the school district says this is qualified by prior general language in the original contract that MCI assumes "all the legal requirements" of the school district. The school district argues that these requirements include the statutory obligation of public schools to afford a hearing for a suspension of more than 10 days. See 20-A M.R.S.A. § 1001(9). This reading of the contract is disputed by MCI, but if a court accepted it, it might give Zach, as a third party beneficiary, a contract claim against MCI. See, e.g., F.O. Bailey Co., Inc. v. Ledgewood, Inc., 603 A.2d 466, 468 (Me. 1992).
 
 
 30
 Much more important, we think it plain that the school district is obliged by state law to assure that Zach — and any other student not shown to be incorrigibly dangerous or disruptive, cf. 20-A M.R.S.A. § 1001(9) — does have a free secondary education. If Zach were wrongly expelled by MCI (here he was not expelled at all), the school district would still be obliged to provide him with adequate schooling. See id. § 2; see also Me. Const. art. VIII, pt. 1, § 1. How it would do so would be its problem — in all likelihood it would lean heavily upon MCI to readmit him — but surely a Maine court would compel the school district to satisfy its statutory obligation by providing him an education.[2]
 
 
 31
 The reality is that we are all dependent on private entities for crucial services and, in certain key areas, competition may not furnish protection. Consider, for example, towns in which electric, gas, or bus service is privately provided under franchise. Thus far, the Supreme Court has declined to impose due process requirements on such institutions. E.g., Jackson, 419 U.S. at 353-54 & n. 9, 95 S.Ct. 449. It perceives, as we do here, that state statutory and administrative remedies are normally available to deal with such abuses and that "constitutionalizing" regulation of private entities is a last resort.
 
 
 32
 Less needs to be said about plaintiff's other target on appeal: the school district and its superintendent. Certainly, both the former, as well as the latter when acting in his official capacity, are state actors. Avery v. Midland County, 390 U.S. 474, 479-80, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); West, 487 U.S. at 50, 108 S.Ct. 2250. They therefore have responsibility for their own acts and, under certain circumstances, for the misconduct of others subject to their authority. But neither alternative is of much help to plaintiff in this case.
 
 
 33
 Plaintiff says that these defendants violated due process when they failed to include in the contract with MCI protections against improper discipline, such as specific standards or procedures for MCI to follow or some veto for the school district over serious disciplinary action. This claim faces an uphill battle: subject to limited qualifications, inaction by state actors is ordinarily not treated as a due process violation by the state actor, even though this permits harm to be caused by others. See DeShaney v. Winnebago County Soc. Servs. Dep't, 489 U.S. 189, 197-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).[3]
 
 
 34
 Plaintiff points to cases in which the state actor (e.g., a municipality) has responsibility for other state actors (e.g., its police officers). Although respondeat superior doctrine does not apply in such cases, the Supreme Court has carved out a narrower rule under which inaction — namely, a failure to supervise adequately — may result in liability for the constitutional violations committed by state-actor subordinates. City of Canton v. Harris, 489 U.S. 378, 386-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But MCI was not a state actor at all, let alone a subordinate, so the Monell doctrine does not apply.[4]
 
 
 35
 Plaintiff also points out that in this case the school district acted by choosing (as permitted by state law) to "contract out" to a private actor its own state-law obligation to assure education for students in the district. But localities contract all the time with private entities to provide local services (e.g., to repair roads or collect trash). The locality does not thereby become liable under the Due Process Clause for failing to insist that the private entity offer exactly the same level of procedural protections to employees or beneficiaries of the services that government must afford when it acts for itself.
 
 
 36
 As his final argument, Zach argues that the school district had a due process obligation to hold its own hearing and, if it disagreed with MCI's suspension, provide him with an alternative placement. This claim appears to be a variant of the one just discussed. In so far as it is a separate argument, the district court said that it had not been preserved and declined to address it. Logiodice, 170 F.Supp.2d at 30 n. 12. Plaintiff's brief makes little effort — and certainly not a persuasive one — to show that the district court was mistaken.
 
 
 37
 These federal constitutional claims are to be distinguished, of course, from potential claims available to Zach under Maine law. In the absence of federal claims, the district court was entitled to leave those to the state courts, as it did here. 28 U.S.C. § 1367(c) (2000). In this, as in other respects, the district court's opinion is a model of careful analysis.
 
 
 38
 Affirmed. Each side shall bear its own costs on this appeal.
 
 
 
 Notes:
 
 
 [1]
 E.g., Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
 
 
 [2]
 See also Lyons v. Bd. of Dirs. of Sch. Admin. Dist. No. 43, 503 A.2d 233, 235-37 (Me.1986) (Me. R. Civ. P. 80B allows action to compel school board to vindicate statutory or constitutional rights); Soderstrom v. Me. Sch. Admin. Dist. No. 61, 2001 WL 1711497, *2 (Me.Super.2001) (student can bring claim of wrongful expulsion against school district under Me. R. Civ. P. 80B).
 
 
 [3]
 DeShaney distinguished the principal exception, which exists where the state has confined a prisoner or other detainee and so made itself responsible for physical or medical protection. 489 U.S. at 197-200, 109 S.Ct. 998 (citing Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and Estelle, 429 U.S. at 103-04, 97 S.Ct. 285).
 
 
 [4]
 Cf. City of Los Angeles v. Heller, 475 U.S. 796, 798-99, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir.1996); Willhauck v. Halpin, 953 F.2d 689, 714 (1st Cir.1991).
 
 
 
 39
 LIPEZ, Circuit Judge, dissenting.
 
 
 40
 The issues in this case are difficult. The district court explored them ably in its decision. So too has the majority. In the end, however, I disagree with the majority that treating the Maine Central Institute (MCI) as a state actor on the facts of this case would require an insupportable expansion of state action doctrine. Instead, I believe that the application of the entwinement doctrine to the facts of this case requires the conclusion that MCI and Maine School Administrative District No. 53 (MSAD No. 53) are entwined in the common enterprise of providing publicly funded education to nearly all high school students in MSAD No. 53. Furthermore, other indicia of state action present here make the actions of MCI fairly attributable to the state. For all practical purposes, MCI is the public high school of MSAD No. 53 and should be treated as such when it disciplines a publicly funded student in a manner that arguably contravenes the due process guarantees of the Fourteenth Amendment.
 
 I. Background
 
 41
 Although the majority has fairly set forth the facts here, I also wish to set forth some facts important for a full understanding of this case.
 
 A. The Incident
 
 42
 Two angry outbursts from Logiodice on January 19, 2000, initiated the chain of events that led to this lawsuit. Logiodice arrived in the gymnasium at MCI with several of his classmates twenty minutes before the scheduled start of his mid-term examination in Advanced Placement English. He was drinking a soda. The proctor for the exam asked Logiodice for his drink and put it on the bleachers. According to Logiodice, "[b]ecause the test had not started and ... others [were] drinking and eating," he retrieved his drink. When the proctor again insisted on taking the drink from him, Logiodice shouted at him and refused to give him the drink. The proctor then sent for Dean of Students John Marquis, who questioned Logiodice about his reaction to the proctor. Logiodice responded angrily to Dean Marquis, who permitted him to take the examination but also decided to suspend him for ten days.
 
 
 43
 Dean Marquis then called Logiodice's mother at work, and asked her to take him home. She came to meet with Marquis, who told her that Logiodice would be suspended for ten days for swearing and for refusing to comply with a teacher's requests. According to Logiodice, he "was not present at this meeting, nor was he allowed to present his version of the event that had occurred or any mitigative factors." However, his mother did protest the length of the suspension at this initial meeting.
 
 
 44
 Later that day, both of Logiodice's parents met with Dean Marquis. Although they conceded that Logiodice acted inappropriately, they also asked Marquis to reconsider the length and scope of the suspension. Both parents pleaded with Marquis to permit Logiodice to participate in extracurricular activities during the suspension. If he were excluded from such activities, he would likely lose his lead role in the school play and his place on the wrestling team. Marquis refused these requests.
 
 
 45
 On or about January 22, Logiodice's parents received a letter from Marquis, informing them that Logiodice could not return to school until he was enrolled in counseling and passed a "safety evaluation" certifying that he was not a threat to himself or other students. Logiodice's parents called Marquis on January 22 and told him that it was difficult to find a therapist covered by insurance who could see Logiodice immediately. By February 1, they still had not found a counselor willing to offer such an evaluation. Logiodice's ten-day suspension would have concluded that day if he had not been required to obtain a safety evaluation. Hoping to return his son to school, Logiodice's father called Principal Cummings on February 1 and asked if Logiodice could be re-admitted pending a safety evaluation. When Cummings refused, Logiodice's father offered to stay with his son to ensure that no "safety situation" arose. Cummings would not relent.
 
 
 46
 Logiodice's parents then called Dr. Lester, a counselor covered by their insurance plan. According to Logiodice's mother, Dr. Lester told Logiodice's father that "you aren't going to find anybody to give a, quote, unquote, safety evaluation. That's not something that's done." Dr. Lester did agree to call Dean Marquis at MCI to find out "exactly what they're looking for." After speaking to Marquis, Dr. Lester told Logiodice's mother that "he couldn't do what they were asking for"; however, he did offer to see Logiodice. Logiodice's parents agreed to set an appointment for Logiodice to see Dr. Lester.
 
 
 47
 Logiodice's parents also spoke to Superintendent McCannell of MSAD No. 53, and presented their case to the Board of MSAD No. 53. At a meeting on February 1, 2000, McCannell told Logiodice's parents that he would try to help them. McCannell wrote a letter to Principal Cummings of MCI expressing concern that Logiodice's indefinite suspension violated his due process rights and Maine state law since it had been imposed without a hearing.
 
 
 48
 McCannell and Cummings called Logiodice's parents on February 8 (seventeen days after the suspension began) to notify them that Logiodice would be allowed to return to school if Logiodice's counselor met with them after a second session with Logiodice. Dr. Lester agreed, and on February 11, 2000, Logiodice, his parents, Dr. Lester, McCannell, Cummings, and several MCI teachers all met. At this meeting, Dr. Lester expressed his opinion that Logiodice did not pose a threat to himself or others. According to Logiodice's mother, Dr. Lester essentially told the MCI authorities at the meeting that they had "overreacted." After this meeting, Logiodice was permitted to return to school on February 15, 2000.
 
 B. The District Court's Decision
 
 49
 Logiodice filed suit, alleging that his suspension violated the Due Process Clause of the Fourteenth Amendment, which prohibits the state from depriving its citizens of a property interest (here, in education) without due process of law. See Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause"). Recounting the events in this case, the district court observed that MCI officials suspended Logiodice without "providing [him] prior notice or offering him an opportunity to explain his behavior." Logiodice v. Trs. of Me. Cent. Inst., 170 F.Supp.2d 16, 20 (D.Me.2001). However, the district court entered summary judgment for defendants, concluding that MCI was not a state actor and, relatedly, that there was no basis for ascribing liability to the other defendants under § 1983.
 
 II. Entwinement
 A. General Principles
 
 50
 An ostensibly private entity acts under color of state law "when it is `entwined with governmental policies' or when government is `entwined in [its] management or control.'" Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting Evans v. Newton, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966)). Entwinement doctrine identifies state action in situations where neither the government nor the private entity controls a given sphere of activity, but both are so involved in that activity that the actions of the private actor in that sphere are "fairly attributable" to the state. Id. at 295, 121 S.Ct. 924.
 
 
 51
 Besides the entwinement test (and the related symbiotic relationship test),[1] there are two main tests of state action relevant to this case: the public function test and the nexus test. Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir.1999) (noting that "courts conventionally have ... deem[ed] a private entity to have become a state actor if (1) it assumes a traditional public function when it undertakes to perform the challenged conduct, or (2) an elaborate financial or regulatory nexus ties the challenged conduct to the State, or (3) a symbiotic relationship exists between the private entity and the State"). Public function doctrine permits a finding of state action when a "private entity [has] assumed powers `"traditionally exclusively reserved to the State."'" Rockwell v. Cape Cod Hosp., 26 F.3d 254, 258 (1st Cir.1994) (quoting Rodriques v. Furtado, 950 F.2d 805, 813 (1st Cir.1991) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974))). The nexus test examines "whether the government exercised coercive power or provided such significant encouragement that the complained-of misconduct... must be deemed to be the conduct of the government." Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 493 (1st Cir.1996). Thus, both the public function and nexus tests are primarily concerned with control: the former identifies state action where a private actor controls a function traditionally performed by the government exclusively, while the latter identifies state action where the government effectively controls a private actor. By contrast, entwinement doctrine identifies state action in situations where neither the government nor the ostensibly private actor controls a given sphere of activity, but both are so involved in that activity that the actions of the private actor in that sphere are "fairly attributable" to the state. Brentwood, 531 U.S. at 295, 121 S.Ct. 924.
 
 
 52
 The different focus of the entwinement test is complemented by a different style of analysis than that prevailing in the public function and nexus tests. Application of the latter tests typically turns on relatively straightforward, concrete inquiries — for example, whether a private actor once performed the purportedly exclusively traditionally public function, see Rockwell, 26 F.3d at 258-59, or whether the government actually commanded the action challenged in the given suit, see Blum v. Yaretsky, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (holding that "constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains"). Entwinement analysis is more nuanced and complex, examining whether the range of contacts between the state and the ostensibly private actor amount to a critical mass of entwinement, thereby rendering the private entity's actions "fairly attributable" to the state. See Brentwood, 531 U.S. at 295, 121 S.Ct. 924. As one commentator has observed, the entwinement test "examines the totality of circumstances surrounding relationships of states and private entities when determining whether such relationships resulted in state action."[2]
 
 B. The Brentwood Factors
 
 53
 In Brentwood the Supreme Court addressed whether the Tennessee Secondary School Athletic Association (TSSAA) was a state actor in its enforcement of disciplinary rules against member schools. The TSSAA promoted and regulated athletic events among the high schools of Tennessee. The Court identified several facts indicating that the "nominally private character of the [TSSAA] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." Id. at 298, 121 S.Ct. 924.
 
 
 54
 First, the Court found that public schools dominated the membership of the TSSAA — 290 of its 345 voting members were public schools. Id. at 298-99, 121 S.Ct. 924. These public schools contracted with the TSSAA and played an important role in running it. Their agents (including principals and superintendents) served on the nine-member Legislative Council that promulgated the recruiting rules challenged in the case. Id. at 299, 121 S.Ct. 924. As the Court observed, "[s]ince a pickup system of interscholastic games would not do, these public [schools] need[ed] some mechanism to produce rules and regulate competition." Id. at 299, 121 S.Ct. 924. By assigning the TSSAA this role, "the 290 public schools of Tennessee belonging to it can sensibly be seen as exercising their own authority to meet their own responsibilities." Id.
 
 
 55
 The Court also closely analyzed the financial relationship between the public schools and the TSSAA. Although the TSSAA only received 4% of its revenue from dues paid by member schools, its main source of revenue was "gate receipts at tournaments among the member schools." Id. This arrangement permitted the TSSAA to "enjoy[ ] the schools' moneymaking capacity as its own." Id. Reviewing the public schools' financial relationship with the TSSAA and their role in its leadership, the Court concluded that the Association could not be deemed a mere contractor: "Unlike mere public buyers of contract services, whose payments for services rendered do not convert the service providers into public actors, see Rendell-Baker v. Kohn, 457 U.S. 830, 839-843, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the schools here obtain membership in the service organization and give up sources of their own income to their collective association." Id. at 299, 121 S.Ct. 924.
 
 
 56
 The Court found some additional indicia of entwinement at the state level: members of the state Board of Education served on the TSSAA's board, and the state Board had designated the TSSAA as "regulator of interscholastic athletics in public schools" from 1972 to 1996. Id. at 300, 102 S.Ct. 2764. Furthermore, "the [TSSAA]'s ministerial employees [were] treated as state employees to the extent of being eligible for membership in the state retirement system." Id.
 
 
 57
 Brentwood thus identified a close relationship between TSSAA and the state in two categories: "bottom up" public influence over the association via the participation of its public school members in TSSAA leadership, and "top down" influence exercised by state officials entitled to serve on the TSSAA's board. Id. at 300-01, 121 S.Ct. 924. Taken together, the numerous and significant contacts between the TSSAA and government actors within these categories led the Court to conclude that the TSSAA's entwinement with state actors rendered it a state actor itself.
 
 C. The MCI Factors
 
 58
 In my view, there is at least as much entwinement between MCI and governmental entities in Maine as there was between the TSSAA and public actors in Tennessee. Although MCI does not operate at the statewide scale of the TSSAA, its responsibility for the education of publicly funded high school students in MSAD No. 53 mirrors the TSSAA's responsibility for the regulation of athletic events among the public schools of Tennessee. Just as Tennessee public schools "exercis[ed] their own authority to meet their own responsibilities" by delegating the regulation of interscholastic athletic events to the TSSAA, id. at 299, 121 S.Ct. 924, MSAD No. 53 has exercised its authority by delegating to MCI its responsibility for educating high school students in the district. Moreover, MCI is not just a provider of services to MSAD No. 53. It is a partner of the district in educating the district's high school students.
 
 
 59
 MSAD No. 53 is the governmental entity responsible for educating children in Pittsfield, Burnham, and Detroit, Maine. MCI is the only high school — public or private — located within the district. MSAD No. 53 sends nearly all of its high school students to MCI at public expense. Approximately 400 of the 500 students at MCI are publicly funded by MSAD No. 53.
 
 
 60
 MCI and MSAD No. 53 have signed a series of ten-year contracts (for terms starting in 1983, 1993, and 2003) setting forth their respective roles and responsibilities in educating the high school students in MSAD No. 53. The two entities agreed that a joint committee, consisting of four members from each entity, would adjudicate any conflicts that may arise in interpreting the contract. The contract between MSAD No. 53 and MCI in effect at the time of this dispute gave MCI's trustees "the sole right to promulgate, administer, and enforce all rules and regulations pertaining to student behavior [and] discipline," but also obliged MCI to assume "all the legal requirements" of the school district. The precise meaning of this latter phrase was the crux of a disagreement between MSAD No. 53 Superintendent Terrance McCannell and Principal Cummings over MCI's obligation to provide Logiodice a hearing before disciplining him. McCannell believed that federal and state law required MSAD No. 53, and thus MCI, to afford due process protections to publicly funded students at MCI. Cummings believed that MCI was a private school that did not have to provide suspended or expelled students with a hearing. Though they still disagree about the meaning of the contract, McCannell and Cummings worked together to devise a response to Logiodice's situation once the difficulty of obtaining a "safety evaluation" became apparent.
 
 
 61
 Their common involvement in Logiodice's case reflected a long history of formal and informal cooperation between the leaders and staff of MSAD No. 53 and MCI. Superintendent McCannell and Principal Cummings routinely consult each other on many administrative and scholastic matters; Cummings attends the board meetings of MSAD No. 53 regularly. Their respective staffs work together each year to prepare a joint academic calendar, and MCI defers to MSAD No. 53's decisions regarding school closure due to inclement weather. MCI staff provides attendance reports to MSAD No. 53.
 
 
 62
 Beyond these bureaucratic matters, MSAD No. 53 plays a crucial role in "transitioning" students from the indisputably public Warsaw Middle School into MCI. MSAD No. 53 requires students to meet with representatives of MCI during their eighth grade year to plan study schedules with them. Academic records flow from MSAD No. 53's middle school directly to MCI without notice to parents that their children will be attending a private school. This administrative convenience has legal significance: federal law requires schools to maintain confidentiality of educational records and places conditions on the transfer of such records to outside agencies or schools. 20 U.S.C. § 1232g(b)(1). MCI is not treated as an outside agency or school.
 
 
 63
 Neither the state of Maine nor MSAD No. 53 treats MCI as a mere vendor, exchanging educational services for state funding. MSAD No. 53 is statutorily obliged to assist MCI with facilities maintenance and debt service. Me.Rev.Stat. Ann. tit. 20-A, § 5806(2). It pays an amount equal to ten percent of the publicly funded students' tuition each year for this purpose.[3] Id. MSAD No. 53 funds MCI's special education program and provides extracurricular transportation for all MCI students, who frequently compete with students enrolled in public high schools. MCI derives more than half its income from MSAD No. 53 tuition. See Logiodice, 170 F.Supp.2d at 18 (observing that "[f]ifty-one percent of MCI's income is derived from tuition payments from MSAD No. 53"). MCI's faculty handbook states that MCI is part of a K-12 educational system.
 
 
 64
 Mirroring the "top down" entwinement found in Brentwood, 531 U.S. at 300, 121 S.Ct. 924, several Maine statutes regulate the relationship between school administrative districts and contract schools like MCI. Maine permits school administrative districts to contract with "a private school approved for tuition purposes" in order to provide education to district students. Me.Rev.Stat. Ann. tit. 20-A, § 1258(2). Moreover, Maine's Department of Education and State Board of Education are developing a "comprehensive, statewide system of learning results." Id. § 6209. Public schools are "required to participate" in the system, as are "private school[s] approved for tuition that enroll[ ] at least 60% publicly funded students." Id. Thus MCI — which enrolls approximately 80% publicly funded students — must assure that its entire curriculum and career preparation program reflect state-mandated goals. Id. The statutory line-drawing that led to the school's inclusion in that system is instructive. The state of Maine recognizes that ostensibly private schools with student bodies dominated by publicly funded students are essentially public educators, properly subject to the same rules and guidelines that govern officially public schools.
 
 
 65
 There is a close parallel between the public school membership of the TSSAA and the publicly funded student body of MCI. The association had 84% public high school members, while MCI has 80% public high school students. Of course, the students' membership in MCI is not directly analogous to the high schools' membership in TSSAA; they may only "join" for the years they are eligible for secondary education. However, Maine students are compelled by the state to go to school until age 17, see Me.Rev.Stat. Ann. tit. 20-A, § 5001-A(1), while Tennessee never forced its high schools to join the TSSAA. As the majority points out, MCI "is for those in the community the only regular education available for which the state will pay." High school students in MSAD No. 53 may only avoid attending MCI at a high cost to themselves or their families: they can either violate the compulsory education law or leave their peers and community to find private education elsewhere. This dimension of the case makes MCI far more of a state actor with respect to the publicly funded students in its student body than the TSSAA was with respect to its public school members, whose participation in that organization was purely voluntary. Id. at 306, 121 S.Ct. 924 (Thomas, J., dissenting) (observing that "the TSSAA does not require that public schools constitute a set percentage of its membership, and, indeed, no public school need join the TSSAA").
 
 
 66
 MCI is so reliant on public sources of funding and support, and MSAD No. 53 is so reliant on MCI to educate its high schoolers, that they are not merely contractors engaged in an "arm's length" transaction. Their ten-year contracts (the maximum length permissible under state law, see Me.Rev.Stat. Ann. tit. 20-A, § 1258(2)) entwine them in the joint project of educating the publicly funded students of MSAD No. 53. The two institutions are seamlessly integrated in the joint project of providing education to publicly funded high school students in the district. Their entwinement and mutual dependence make MCI the public high school of MSAD No. 53.
 
 
 67
 Although the majority acknowledges that there are a number of "connections between the state, the school district, and MCI," it concludes that two facts decisively demonstrate a lack of entwinement here: MCI is run by private trustees, and MSAD No. 53 did not control the disciplinary process that resulted in Logiodice's suspension. However, similar conditions existed in Brentwood, and they did not prevent a finding of state action there.
 
 
 68
 Like those of MCI, the TSSAA's "rules [were] enforced not by a state agency but by its own board of control." Brentwood, 531 U.S. at 308, 121 S.Ct. 924 (Thomas, J., dissenting). If we were applying the nexus analysis here, it would be important to determine who has ultimate authority over the policies of MCI for the students in MSAD No. 53. See Barrios-Velazquez, 84 F.3d at 493. However, when "the facts justify a conclusion of state action under the criterion of entwinement, [that] conclusion [is] in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts." Brentwood, 531 U.S. at 302, 121 S.Ct. 924. State action has been identified under the entwinement test even where private trustees control the relevant institution. Brentwood itself was based in part on Evans v. Newton, where the Court found state action even though the trustees of a park were private citizens. See Evans, 382 U.S. at 302, 86 S.Ct. 486 (holding that "the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law"); see also Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (finding state action where private corporation controlled all real estate in town). The key inquiry is the level of joint involvement in a common enterprise — not whether the government ultimately controls the challenged conduct.
 
 
 69
 Although its superintendent was deeply involved in Logiodice's case after his suspension exceeded ten days, MSAD No. 53 did not direct MCI to discipline Logiodice. The majority holds that, because MSAD No. 53 was not involved in the "particular activity sought to be classed as state action," Blum militates against deeming MCI a state actor. See Blum, 457 U.S. at 1004-05, 102 S.Ct. 2777. This fact — while important in a nexus case like Blum — is not dispositive under the entwinement doctrine. Therefore, the Supreme Court in Brentwood still found entwinement even though the state of Tennessee was not involved with the disciplinary action challenged there, or the promulgation of rules governing it:
 
 
 70
 [T]he State of Tennessee has never had any involvement in the particular action taken by the TSSAA in this case: the enforcement of the TSSAA's recruiting rule prohibiting members from using "undue influence" on students or their parents or guardians "to secure or to retain a student for athletic purposes." There is no indication that the State has ever had any interest in how schools choose to regulate recruiting.
 
 
 71
 Brentwood, 531 U.S. at 308, 121 S.Ct. 924 (Thomas, J., dissenting) (footnote and citations omitted). Tennessee's lack of involvement did not matter there because Blum's emphasis on the strength of the nexus between the state and the private actor with respect to the challenged conduct predated Brentwood's articulation of the modern entwinement doctrine. See Cooper, supra, 35 Creighton L.Rev. at 985 (describing how Brentwood revived methods of analysis employed by the Supreme Court prior to Blum, when it usually "did not analyze state action claims by examining the specific conduct in question"). While relevant to the entwinement inquiry, the "specific conduct" factor emphasized in Blum is not controlling.
 
 
 72
 In sum, given all of the factors cited here, I conclude that the application of the entwinement doctrine elaborated by the Supreme Court in Brentwood requires the conclusion that MCI and MSAD No. 53 are so entwined in the common enterprise of providing publicly funded education to nearly all high school students in the district that MCI should be deemed a state actor answerable for its actions pursuant to § 1983.
 
 III. West v. Atkins
 
 73
 Although I believe that the entwinement doctrine suffices to establish MCI's status as a state actor, I find additional support for this conclusion in the finding of state action in West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), where a governmental authority delegated an important public responsibility to an ostensibly private party. I agree with the majority that education in Maine has not traditionally been a function performed exclusively by the state. Given this fact, the majority properly declines to find state action by MCI under the public function doctrine, which applies only where a private actor performs a function "traditionally exclusively reserved" to the state. Flagg Bros. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (internal quotation marks omitted). However, the Supreme Court has also indicated that the performance of a public function in tandem with other indicia of state action may render a private entity a state actor, even if that function is not traditionally reserved exclusively to the state. See, e.g., Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621-24, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (supporting finding of state action with evidence that the challenged conduct involved "a traditional governmental function" without examining whether the function was traditionally the exclusive prerogative of the state). In West, the Court did not base its decision on the public function doctrine, but focused instead on the fact that the state had delegated to a private actor a duty it was affirmatively obligated to provide. The same is true here.
 
 
 74
 The Supreme Court held in West that a prison doctor was a state actor within the meaning of § 1983, even though the doctor was an independent contractor not formally employed by the state. Id. at 56-57, 108 S.Ct. 2250. In finding state action, the Court focused on the doctor's role in offering services that the state was constitutionally obliged to provide. The ostensibly private contractor Dr. Atkins "worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated." Id.
 
 
 75
 Just as Dr. Atkins contracted with the state of South Carolina to perform its nondiscretionary duty to provide health care to prisoners, MCI contracted with MSAD No. 53 to perform its nondiscretionary duty to educate its high school students. As in West, "[t]he State bore an affirmative obligation to provide [education to the appellant]; the State delegated that function to [MCI]; and [MCI] voluntarily assumed that obligation by contract." Id. at 56, 108 S.Ct. 2250.
 
 
 76
 West may seem inapposite here because prisoners enjoy a federal constitutional right to medical care, while students have no parallel federal entitlement to education. Compare Youngberg v. Romeo, 457 U.S. 307, 315, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (recognizing prisoner's rights to medical care, food, shelter, and clothing), with San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35-39, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (declining to recognize a federal constitutional right to education). However, Maine state law obliges the Maine legislature to "require[ ] the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools." Me. Const. art. VIII, pt. 1, § 1; see also Me.Rev.Stat. Ann. tit. 20-A, §§ 2, 5001-A(3). As surely as West had a right under federal law to medical services, students in Maine have a right under its constitution to an education. Moreover, in the dimension that is relevant to this case — the provision of publicly funded education — the students in the district are as dependent on MCI as West was on the state for the provision of medical services. For high school students in the district, MCI provides the only education available for which the district will pay.
 
 
 77
 Although there are precedents rejecting claims of state action by private schools, those holdings were based on facts that differ substantially from those here. MCI does not merely serve one subset of the student population. Instead, it is obligated by contract to educate all high school students in MSAD No. 53. Compare Rendell-Baker, 457 U.S. at 832, 102 S.Ct. 2764 (considering the status of a school that "specialize[d] in dealing with students who have experienced difficulty completing public high schools"), and Robert S. v. Stetson Sch., Inc., 256 F.3d 159, 162-63 (3d Cir.2001) (declining to find state action by a "private, residential institution" designed to educate sex offenders and not "obligated to accept any student"). Other precedents rejecting claims that contract schools are state actors involved their teachers, not their students. See Rendell-Baker, 457 U.S. at 851, 102 S.Ct. 2764 (Marshall, J., dissenting) (noting that "the majority ... focuses on the fact that the actions at issue here are personnel decisions [and] would apparently concede that actions directly affecting the students could be treated as under color of state law, since the school is fulfilling the State's obligations to those children"); Johnson v. Pinkerton Acad., 861 F.2d 335, 338 (1st Cir.1988) (noting that, "[i]f there were responsibilities in the present case, they would relate to students, and not to teachers"); see also Rendell-Baker v. Kohn, 641 F.2d 14, 26 (1st Cir.1981) (1982) (observing that "those students ... compelled to attend [school] under the state's compulsory education laws, would have a stronger argument than do plaintiff[ ] [teachers] that the school's action towards them is taken `under color of' state law"), aff'd, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). While a teacher does not depend on any one school for employment opportunities, students in a given school district (such as the high school students of MSAD No. 53) may be entirely dependent on one school for a publicly funded education. Therefore, finding state action here under West would be consistent with extant state action decisions regarding contract schools.
 
 IV. Other Considerations
 
 78
 While Brentwood and West support a finding of state action, "[e]ven facts that suffice to show public action ... may be outweighed in the name of some value at odds with finding public accountability in the circumstances." Brentwood, 531 U.S. at 303, 121 S.Ct. 924. The majority concludes that Logiodice's grievances were not serious enough to warrant the kind of burdens that state actor status would place on contract schools like MCI, particularly given the alternative means of redress available. I address these points.
 
 A. Burdens on Contract Schools
 
 79
 When discussing the burdens imposed by state actor status, the majority recognizes the interests of contract schools in avoiding the "rigidities [and] lawsuits" that accompany state actor status. Given the increasing levels of violence plaguing schools today, I agree that we must respect the school administrators' disciplinary prerogatives. However, we do not have to exempt a school such as MCI from all constitutional standards to advance that goal. Instead, we can respect those prerogatives within a constitutional framework.
 
 
 80
 The Supreme Court has done just that. Indeed, it "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The exigencies of the educational process may trump both First Amendment rights, see Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273-74, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (permitting principal to censor student newspaper), and Fourth Amendment rights, see Bd. of Educ. v. Earls, ___ U.S. ___, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (permitting random drug tests of students without finding of probable cause of drug abuse). Furthermore, a finding of state action here will not result in the "constitutionalization" of all contract schools. As noted, the entwinement analysis is highly fact-specific. There are unusual facts here that may not be easily replicated, including the provision of all educational services to nearly all high school students in a school district.
 
 B. Alternative Means of Redress
 
 81
 Since MCI's contract with MSAD No. 53 required MCI to assume "all the legal requirements" of the school district, the majority notes that Logiodice could sue MCI in state court as a third party beneficiary of the contract. If the more serious disciplinary action of expulsion had been imposed, Logiodice would still be a public charge of MSAD No. 53, which would be obliged to provide him with an education.
 
 
 82
 I do not believe these arguments adequately address this case or its implications. As the majority observes, the contract renders MCI "subject only to an arguable obligation to comply with regulations governing the school district." Given the ongoing dispute between MCI and MSAD No. 53 over the meaning of the contract, its uncertain import offers uncertain relief.
 
 
 83
 Short of expulsions, there are many sanctions that can be imposed on students in an ostensibly private school that would significantly affect the educational experience of the students without implicating the legal obligation of the state to provide the students with an education. As this case illustrates, the stakes can be high for a publicly funded student in a school like MCI with discipline less dramatic than expulsion.
 
 C. Seriousness
 
 84
 Given the length of a school year or the length of a high school education, seventeen days of suspension may not seem like a big deal. Whatever the complete story here, Logiodice clearly asked for some of the trouble he received with his inappropriate conduct. But therein lies the problem. Before there was any evaluation of the complete story at anything resembling a hearing, the officials at MCI decided that Logiodice could not return to school before he received a "safety evaluation" from a counselor certifying that he was not a threat to himself or other students. That requirement had the inevitable effect of prolonging his suspension beyond the decreed ten days and labeling Logiodice as potentially dangerous. In imposing that label, MCI imposed a serious sanction on Logiodice with potential repercussions far beyond this incident. As the Supreme Court has recognized, such "charges could seriously damage ... students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." Goss, 419 U.S. at 575, 95 S.Ct. 729. Logiodice may have to explain this disciplinary record, including the psychological "safety" evaluation, if he applies to an institution of higher education or even when he applies for jobs.
 
 
 85
 While "the length and consequent severity of a deprivation ... is not decisive of the basic right to a hearing of some kind," they are factors "to weigh in determining the appropriate form of hearing." Id. at 576, 95 S.Ct. 729 (internal quotation marks omitted). Regrettably, the important contest over the procedural protections to which Logiodice was entitled will never be joined if MCI is not deemed a state actor. In my view, for all of the reasons stated, MCI is a state actor in the education of its publicly funded students and its conduct should be reevaluated on that basis.
 
 V. Conclusion
 
 86
 After determining that MCI is not a state actor, the majority also assesses the liability of MSAD No. 53 under § 1983. I will not do so here. In my view, a determination that MCI is a state actor so fundamentally changes the analysis of MSAD No. 53's liability under § 1983 that we should remand the case to the district court with instructions to reevaluate the liability of MSAD No. 53 in light of MCI's status as a state actor.
 
 
 87
 On the basis of the summary judgment record presented here, I see no reason why students should enjoy constitutional protections when they attend the Warsaw Middle School, but then "shed their constitutional rights ... at the schoolhouse gate" of MCI, Tinker, 393 U.S. at 506, 89 S.Ct. 733, when that gate leads to the only publicly funded high school education for students in the district. Entwinement doctrine, West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, and the other considerations cited above, all lead to the conclusion that MCI's actions in this case are fairly attributable to the state. Therefore, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Symbiotic relationship doctrine considers whether the government "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity."Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 494 (1st Cir.1996) (internal quotation marks omitted).
 
 
 [2]
 Megan M. Cooper, Casenote,Dusting Off the Old Play Book: How the Supreme Court Disregarded the Blum Trilogy, Returned to the Theories of the Past, and Found State Action Through Entwinement in Brentwood Academy v. Tennessee Secondary School Athletic Association, 35 Creighton L.Rev. 913, 985-86 (2002).
 
 
 [3]
 The relevant statutes regulate the tuition that private schools are permitted to charge state entities, setting "maximum allowable tuition... plus an insured value factor" which "may not exceed 10% of a school's legal tuition rate per student in any one year." Me. Rev.Stat. Ann. tit. 20-A, § 5806(2)